No. 21-2524

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| LYNN STARKEY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Appeal from the United States |
| | ) | District Court for the Southern District |
| v. | ) | of Indiana, Indianapolis Division |
| | ) | |
| ROMAN CATHOLIC | ) | Case No. 1:19-cv-03153 |
| ARCHDIOCESE OF | ) | Judge Richard L. Young |
| INDIANAPOLIS, INC. and | ) | |
| RONCALLI HIGH SCHOOL, INC., | ) | |
| | ) | |
| Defendants-Appellees. | | |

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT LYNN STARKEY

---

Kathleen A. DeLaney (#18604-49)
Matthew R. Gutwein (#16414-49)
Christopher S. Stake (#27356-53)
DELANEY & DELANEY LLC
3646 N. Washington Blvd.
Indianapolis, IN 46205
(317) 920-0400

*Attorneys for Plaintiff-Appellant,*
*Lynn Starkey*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2524

Short Caption: STARKEY V. ROMAN CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC. ET AL

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Lynn Starkey

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
DeLaney & DeLaney LLC (Kathleen A. DeLaney & Christopher S. Stake)

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and
      n/a

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
      n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
   n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
   n/a

Attorney's Signature: /s/ Kathleen A. DeLaney    Date: 8/19/2021

Attorney's Printed Name: Kathleen A. DeLaney

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☒    No ☐

Address: 3646 N. Washington Blvd.

Indianapolis, IN 46205

Phone Number: 317-920-0400    Fax Number: 317-920-0404

E-Mail Address: kathleen@delaneylaw.net

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-2524

Short Caption: STARKEY V. ROMAN CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC. ET AL

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Lynn Starkey

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

DeLaney & DeLaney LLC

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      n/a

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      n/a

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

---

Attorney's Signature: /s/ Matthew R. Gutwein     Date: 10/06/2021

Attorney's Printed Name: Matthew R. Gutwein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 3646 N. Washington Blvd.

Indianapolis, IN 46205

Phone Number: 317-920-0400       Fax Number: 317-920-0404

E-Mail Address: mgutwein@delaneylaw.net

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iii

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................... 1

STATEMENT OF THE CASE..................................................................... 1

I.     Nature of the Case, Course of Proceedings, and
Disposition in the District Court. .................................................. 1

     A.    Starkey Sued Roncalli and the Archdiocese for Terminating
Her Employment as a Guidance Counselor Because of her
Sexual Orientation and Same-Sex Marriage. ............................... 1

     B.    Defendants, via Numerous Motions, Unsuccessfully Sought
to Block Starkey's Case from Proceeding...................................... 2

     C.    The District Court Granted the Defendants' Motion
for Summary Judgment Based on the Ministerial Exception....... 4

II.    Statement of Facts Relevant to the Issues Presented for Review. ........... 5

     A.    Starkey's Early Decades of Employment. ..................................... 5

     B.    Starkey Provided Academic Counseling to Students
as Co-Director of Guidance. ........................................................ 5

     C.    In 2016, the Archdiocese and its Lawyers Decided
that Guidance Counselors Are Not Ministers .............................. 9

     D.    Roncalli's "Ministry" Descriptions and Contracts Had
No Impact on the Day-to-Day Work of Guidance Counselors..... 10

     E.    Roncalli Non-Renews Starkey and Tries to Replace Her............ 12

SUMMARY OF THE ARGUMENT ......................................................... 13

ARGUMENT............................................................................................ 17

I.     Numerous Disputed Material Facts Preclude a Finding as a
Matter of Law that Starkey Worked as a Minister at Roncalli. ........... 17

     A.    This Court Reviews the Summary Judgment Decision
De Novo. ...................................................................................... 17

     B.    The Test for the Ministerial Exception Is Highly Fact Sensitive
and Rests at Bottom on "What an Employee Does." ................... 18

C.      Starkey Presented Ample Facts that Her Work at Roncalli Was Not Ministerial. ..................................................... 22

    1.    Starkey's Work at Roncalli Did Not Make Her a Minister. .... 22

        i.    Starkey Performed No Important Religious Functions as a Guidance Counselor. ................................................... 23

        ii.    Starkey Performed No Important Religious Functions as Co-Director or Member of the Administrative Council. ..... 24

    2.    Archdiocese Admitted that Guidance Counselors Were Not Covered by the Ministerial Exception. ..................................... 26

    3.    Starkey Presented Evidence that Her New Contract and Ministry Description Labeling Starkey as a Minister Were a Pretext. .................................................................. 28

    4.    No Other *Hosanna-Tabor* Factors Apply. ................................ 31

II.    Ignoring the Summary Judgment Standard, the District Court Weighed Disputed Evidence in Favor of Defendants. ............................ 33

    A.    Starkey's New Contract and Ministry Description Did Not Accurately Define Her Job Responsibilities and Starkey Presented Evidence that Those Documents Are Pretextual. .......... 34

    B.    The District Court Cast Aside Starkey's Evidence to Conclude Starkey Was a Minister. ................................................... 36

III.    The Ministerial Exception Does Not Apply to Starkey's State Law Claims Against the Archdiocese. ............................................. 42

CONCLUSION .......................................................................... 44

CERTIFICATES OF COMPLIANCE ........................................ 45

SHORT APPENDIX

# TABLE OF AUTHORITIES

## Cases

*Aparicio v. Christian Union*, 18-CV-0592, 2019 U.S. Dist. LEXIS 55938
 (S.D. N.Y. March 29, 2019) .............................................................. 21

*Billard v. Charlotte Catholic High School*, No. 3:17-cv-00011,
 2021 U.S. Dist. LEXIS 167418 ( W.D. N.C. Sept. 3, 2021) ................. 20, 21, 37

*Bohnert v. Roman Catholic Archbishop of San Francisco*,
 136 F. Supp. 3d 1094 (N.D. Cal. 2015) ........................................... 21, 26, 38, 40

*Darst v. Interstate Brands Corp.*, 512 F.3d 903 (7th Cir. 2008) .............................. 18

*Demkovich v. St. Andrew the Apostle Par.*,
 3 F.4th 968 (7th Cir. 2021) .............................................................. 35-36, 42, 43

*De-Weese Boyd v. Gordon College*, 163 N.E.3d 1000, 1016
 (Mass. S. Ct. 2021) .................................................................... 20-21, 22, 36-37

*Dias v. Archdiocese of Cincinnati*, No. 1:11-cv-00251,
 2013 U.S. Dist. LEXIS 12417 (S.D. Ohio Jan. 30, 2013) ................................. 36

*Fratello v. Archdiocese of New York*, 863 F.3d 190 (2d Cir. Cir. 2017) .................... 40

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*,
 882 F.3d 655 (7th Cir. 2018) ........................................................... 18, 21, 27, 32

*Herx v. Diocese of Fort Wayne-South Bend Inc.*,
 48 F. Supp. 3d 1168 (N.D. Ind. 2014) ................................................. 20, 21, 37

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*,
 565 U.S. 171 (2012) ................................................................................ passim

*Kirby v. Lexington Theol. Seminary*, 426 S.W.3d 597 (Ky. 2014) ........................... 43

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*,
 903 F.3d 113 (3d Cir. 2018) ..................................................................... 44

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
 304 F. Supp. 3d 514 (N.D. Miss. 2018) ...................................................... 43, 44

*O'Leary v. Accretive Health, Inc.*, 657 F.3d 625 (7th Cir. 2011) ........................... 17-18

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020) ........ passim

*Richardson v. Northwest Christian Univ.*,
   242 F. Supp. 3d 1132 (D. Ore. 2017) .................................................. 20, 36, 37

*Sterlinski v. Catholic Bishop of Chicago*, 934 F.3d 568 (7th Cir. 2019) ............ passim

*Sterlinski v. Catholic Bishop of Chicago*, 319 F.Supp. 3d 940 (N.D. Ill. 2018) ......... 21

**Statutes**

42 U.S.C. 2000e.......................................................................................... 1

**Other Authorities**

National Center for Education Statistics Universe Survey, Private Schools, 2017-18,
   *available at* http://nces.ed.gov/surveys/pss/tables/TABLE02fl1718.asp
   (last visited Oct. 26, 2021) .............................................................. 35

Pennsylvania Department of Education, Student Assistance Program (SAP),
   *available at* https://www.education.pa.gov/Schools/safeschools/sap-
   pbis/SAP/Pages/default.aspx (last visited Oct. 26, 2021) .......................... 38-39

California Department of Education, Student Assistance Programs, *available at*
   https://www.cde.ca.gov/ls/he/at/sap.asp (last visited Oct. 26, 2021) .............. 39

Long Reach High School, Student Assistance Program, *available at*
   https://lrhs.hcpss.org/about/student-assistance-program (last visited
   Oct. 26, 2021)............................................................................ 39

Livonia Public Schools, Student Assistance Program, *available at*
   https://www.livoniapublicschools.org/domain/3320
   (last visited Oct. 26, 2021) .............................................................. 39

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction over Plaintiff/Appellant Lynn Starkey's ("Starkey") claims against Defendants/Appellees Roman Catholic Archdiocese of Indianapolis, Inc. ("Archdiocese") and Roncalli High School, Inc. ("Roncalli") (collectively referred to as "Defendants") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

The District Court granted summary judgment on Starkey's claims (ROA, D. # 141[1]), and entered final judgment disposing of all of Starkey's claims (ROA, D. # 142), on August 11, 2021. Starkey filed her Notice of Appeal on August 17, 2021. ROA, D. # 144.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Did material issues of fact about whether Starkey, a high school guidance counselor, qualified as a "minister" for purposes of the First Amendment's ministerial exception, preclude summary judgment?

2.  Does Title VII's ministerial exception apply to Starkey's Indiana common law tort claims against the Archdiocese where the Archdiocese did not employ Starkey?

## STATEMENT OF THE CASE

**I. Nature of the Case, Course of Proceedings, and Disposition in the District Court.**

**A. Starkey Sued Roncalli and the Archdiocese for Terminating Her Employment as a Guidance Counselor because of her Sexual Orientation and Same-Sex Marriage.**

---

[1] References to the record on appeal are referred to as "ROA," with the District Court Docket number ("D. #") and page number, if applicable.

Starkey is a former high school guidance counselor and Co-Director of Guidance at Roncalli, an archdiocesan high school of which the Archdiocese is the sole corporate member. ROA, D. # 20 at 4-5. Starkey, a female, is homosexual and has a female spouse to whom she has been married since 2015. ROA, D. # 1 at 1. In 2019, Roncalli notified Starkey that it would not renew her contract for the next school year because her "civil union is a violation of [her] contract and contrary to the teachings of the Roman Catholic Church." ROA, D. # 27-11.

On July 29, 2019, Starkey sued Roncalli and the Archdiocese, on the following claims: (1) sexual orientation discrimination under Title VII; (2) retaliation under Title VII; (3) hostile work environment under Title VII; (4) retaliation under Title IX; (5) intentional interference with contractual relationship (against the Archdiocese); and (6) intentional interference with employment relationship (against the Archdiocese). ROA, D. # 1 at 7-12.

### B. Defendants, via Numerous Motions, Unsuccessfully Sought to Block Starkey's Case from Proceeding.

Defendants moved to stay all proceedings, pending a ruling from the U.S. Supreme Court on whether sexual orientation is a protected class under Title VII. ROA, D. # 12 at 1. The District Court denied the motion. ROA, D. # 21. Defendants answered Starkey's Complaint on September 27, 2019. ROA, D. # 20. In their Answer, Defendants admitted that Roncalli (not the Archdiocese) employed Starkey from 2009-2019. ROA, D. # 20 at 2.

Defendants moved to bifurcate discovery, asking "that the Court limit initial discovery to determine whether Plaintiff was performing, at the time her contract

was not renewed, ministerial duties within the scope of the ministerial exception." ROA, D. # 25. In an eight-page order authored by the Magistrate Judge, the District Court denied Defendants' motion to bifurcate. ROA, D. # 40. The District Court was "struck by what appear to be significant and material disputes in the facts underlying Starkey's duties with the Archdiocese," and found that "the applicability of the ministerial exception is very much up in the air at this juncture." ROA, D. # 40 at 4. The District Court stated that "it is hard to conclude at this juncture that the applicability of the ministerial exception can be resolved at the summary judgment stage." *Id.* at 6.

Defendants objected to the Magistrate Judge's Order denying the motion to bifurcate, seeking a ruling from the District Judge. ROA, D. # 42. Defendants also requested a stay of the Order denying the motion to bifurcate pending review of its objection. ROA, D. # 43. The District Court granted the Motion to Stay.[2] ROA, D. # 52.

Defendants moved for judgment on the pleadings, asserting various statutory and First Amendment defenses. ROA, D. # 58. Notably, Defendants did *not* seek judgment on the pleadings based on the ministerial exception. ROA, D. # 59 at 15 (stating Defendants' intent to argue ministerial exception in separate summary judgment motion). The District Court denied in part and granted in part the motion for judgment on the pleadings. ROA, D. # 93. The District Court denied judgment on the pleadings on Starkey's Title VII claims and intentional interference claims.

---

[2] The District Court denied the appeal of the motion to bifurcate as moot on March 30, 2021, after the parties had already filed their summary judgment briefs. ROA, D. # 133.

ROA, D. # 93 at 1-2, 19, 25. The District Court granted judgment on the pleadings only on Starkey's Title IX claim, on preemption grounds. *Id.* at 23-25.

Defendants attempted interlocutory appeal of the Order denying the motion for judgment on the pleadings, first by seeking certification of the Order, and then by filing a Notice of Appeal based on the collateral order doctrine. ROA, D. # 95; ROA, D. # 108. The District Court denied Defendants' motion to certify interlocutory appeal. ROA, D. # 130. Ultimately, this Court granted Starkey's motion to dismiss Defendants' appeal. *See* No. 20-3265, Doc. 36 (7th Cir. July 22, 2021).

Due to the approaching deadline to complete liability discovery, and obtain discovery on all relevant matters, Starkey moved to lift the stay of the order denying bifurcation. ROA, D. # 94. The District Court denied Starkey's motion. ROA, D. # 106. The parties completed limited discovery only related to whether the ministerial exception bars Starkey's claims. ROA, D. # 114 at 1, n.1; ROA D. # 126 at 4, n.1.

### C. The District Court Granted Defendants' Motion for Summary Judgment Based on the Ministerial Exception.

Defendants moved for summary judgment on all of Starkey's Title VII and state law claims, arguing that Starkey was a "minister" and that the ministerial exception barred Starkey's claims. ROA, D. # 114 at 1-2. Alternatively, Defendants moved for judgment on the pleadings, seeking reconsideration of its previously rejected statutory and First Amendment defenses, and adding one new defense (RFRA). *Id.* at 2-3.

The District Court granted Defendants' motion for summary judgment. ROA, D. # 141. The District Court concluded that "the Co-Director of Guidance at Roncalli falls within the ministerial exception." *Id.* at 18. The District Court further ruled that the ministerial exception barred all of Starkey's claims, including her state law tort claims against the Archdiocese. *Id.* at 18-19. The District Court declined to address Defendants' other arguments. *Id.* at 19-20. The District Court entered final judgment in favor of Defendants and against Starkey. ROA, D. # 142.

## II. Statement of Facts Relevant to the Issues Presented for Review.

### A. Starkey's Early Decades of Employment.

Starkey began working at Roncalli during the 1978-79 school year. ROA, D. # 127-1, Starkey Dep. at 16. Except for the 1981-82 school year, Starkey worked at Roncalli each year from her start date through the 2018-19 school year, a total of 39 years. *Id.* at 16-17. In the early years, Starkey held various positions with Roncalli. ROA, D. # 127-2. Starkey started as a guidance counselor in the Fall of 1997 and held that position for 10 years. *Id.* She became Co-Director of Guidance in 2007 and held that position for 12 years. *Id.* Shelly Fitzgerald was the other Co-Director of Guidance. ROA, D. # 127-1, Starkey Dep. at 32. Since 1998, Starkey's work at Roncalli has been limited to guidance counselor and Co-Director of Guidance. *Id.*

### B. Starkey Provided Academic Counseling to Students as Co-Director of Guidance.

Starkey's duties as a guidance counselor at Roncalli were to schedule students for classes, assist students with college applications and planning, provide SAT and ACT test preparation tools, administer Advanced Placement exams, and offer

students career guidance. ROA, D. # 127-3, Currens Aff. at 1-2; *see also* ROA, D. # 114-2 at 102-103. As Co-Director of Guidance, Starkey's responsibilities included the course catalog, course description book, budget, and tracking curriculum updates from the Indiana Department of Education. ROA, D. # 127-1, Starkey Dep. at 32-34; ROA, D. # 127-14.

Starkey's job as guidance counselor was "to provide academic, college, and career guidance to students and to provide resources and referrals as needed." ROA, D. # 127-1, Starkey Dep. at 191. Each student met with a guidance counselor at least once a year. ROA, D. # 127-1, Starkey Dep. at 58. Starkey's one-on-one meetings with students addressed academics – class scheduling appointments for freshmen and sophomores, college and career planning for seniors and a combination of both for juniors. ROA, D. # 127-1, Starkey Dep. at 57-58. Autumn Currens, a Roncalli guidance counselor from 2007 to 2019, does not recall a time that she ever prayed with a student during a one-on-one meeting. ROA, D. # 127-3, Currens Aff. at 2. Likewise, Starkey did not lead prayer or pray with students as part of her duties as guidance counselor or co-director. ROA, D. # 127-1, Starkey Dep. at 178, 189; ROA, D. # 127-22 at 5; ROA, D. # 127-4, Fisher Aff. at 1. At the request of the principal, Starkey led a morning prayer over the public address system "less than a handful of times" over her 39-year career at Roncalli, including one time each in 2014 and 2016. ROA, D. # 127-1, Starkey Dep. at 155-157; 189; ROA, D. # 127-20; ROA, D. # 127-21. A broad range of individuals led morning prayer at Roncalli, including

students. ROA, D. # 127-1, Starkey Dep. at 155-156, 190-191; ROA, D. # 114-2 at 25.

Because of her role as Co-Director of Guidance, Starkey served on the Administrative Council. ROA, D. # 127-1, Starkey Dep. at 33-34. Members of the Administrative Council offered thoughts and input to the Principal on the "nuts and bolts, day-to-day" operations of the school. ROA, D. # 127-1, Starkey Dep. at 34-35. Administrative Council meetings generally covered logistical matters, most of which contained little to no religious component. ROA, D. # 114-2 at 483-518. Typical topics that members of the Administrative Council discussed were the logistics concerning upcoming school calendar events, emergency procedures and preparedness, faculty and student recognitions, annual school calendar and exam schedules, school rules and policies, and student and family concerns. ROA, D. # 114-2 at 483-518. The Administrative Council was a multi-disciplinary team, and members with religious titles and responsibilities, such as the campus minister and the chaplain, had more input on religious matters than others. ROA, D. # 114-2 at 297-298 (Starkey Dep. at 41-42). Starkey "would have nothing to say" about religious components of an event. ROA, D. # 114-2 at 350 (Starkey Dep. at 94).

Starkey did not serve on the President's Council, which focuses on Roncalli's mission, financial planning, and strategic planning. ROA, D. # 114-2 at 23. The Faculty Handbook identifies the President, Principal, Assistant Principal for Academic Affairs, Assistant Principal for Student Activities, and Athletic Director

as leaders of the "Faith Community," but excludes Co-Director of Guidance. ROA, D. # 114-2 at 80-81, 83-4, 87, 90-91, 93, 98-100.

The Student Assistance Program ("SAP") helps identify and support at risk students. ROA, D. # 127-1, Starkey Dep. at 47-48. The SAP team included the Assistant Principal for Student Activities, the Dean of Students, the Chaplain, the Campus Minister, the Social Worker, the Guidance Counselors and two teachers. ROA, D. # 127-1, Starkey Dep. at 48. Starkey did not refer many students to the SAP. ROA, D. # 127-1, Starkey Dep. at 51. When she had non-academic concerns about a student, she would refer the student to the Social Worker or Chaplain instead of the full SAP. ROA, D. # 127-1, Starkey Dep. at 51-54.

Starkey does not recall participating in a "Commissioning" or "call and response" during Faculty Day of Reflection. ROA, D. # 127-1, Starkey Dep. at 184; ROA, D. # 127-24; ROA, D. # 114-2 at 26. Roncalli did not mandate that its staff attend Faculty Day of Reflection. ROA, D. # 127-5, Meyer Aff. at 2. Roncalli excused Starkey and other guidance counselors from attending Faculty Day of Reflection when it conflicted with a counselor's appointments with senior and transfer students and their parents. ROA, D. # 127-23 at 6; ROA, D. # 127-3, Currens Aff. at 3-4. Other teachers and counselors similarly do not recall being "Commissioned" as "Minister[s] of the Faith" at these events. ROA, D. # 127-3, Currens Aff. at 3; ROA, D. # 127-5, Meyer Aff. at 2; ROA, D. # 127-6, Phillips Aff. at 2; ROA, D. # 127-7, Dunham Aff. at 1.

Starkey is not a practicing Catholic. ROA, D. # 114-2 at 425-426 (Starkey Dep. at 174-175). Starkey held no formal title within the Catholic Church. ROA, D. # 127-1, Starkey Dep. at 187. Roncalli did not provide Starkey with any training or education on the Catholic faith at any time during her 39 years of employment. ROA, D. # 127-1, Starkey Dep. at 187-188. No one at Roncalli or the Archdiocese informed her that she was a minister of the Catholic faith. ROA, D. # 127-1, Starkey Dep. at 188. Starkey never held herself out as a minister or religious leader or claimed any tax deductions for being a minister on her tax returns. *Id.* No one in Roncalli's administration ever asked her whether she was attending Catholic Mass or donating to the Catholic Church. ROA, D. # 127-1, Starkey Dep. at 188-189.

### C. In 2016, the Archdiocese and its Lawyers Decided that Guidance Counselors Are Not Ministers.

On May 10, 2016, Ginger Thomas, a Human Resources Field Representative employed by the Archdiocese, sent an email to Wendy Lawrie, Human Resources Director at Roncalli, which stated: "We heard from the attorney today. School counselors and social workers do not meet the definition for the ministerial exemption." ROA, D. # 127-8 at 2. Lawrie forwarded the email to Roncalli Principal Chuck Weisenbach. *Id.* Weisenbach asked why a licensed guidance counselor was treated differently than a licensed teacher, and Lawrie responded that the "decisions are coming from attorney's [sic] at the Archdiocese." *Id.* Starkey, as Co-Director of her department, was concerned that Roncalli would attempt to reduce the pay and job security of counselors. ROA, D. # 127-1, Starkey Dep. at 107-108.

### D. Roncalli's "Ministry" Descriptions and Contracts Had No Impact on the Day-to-Day Work of Guidance Counselors.

From 2007-2017, Roncalli titled Starkey's employment contracts as "School Teacher Contract." Roncalli included no express religious duties in any of these ten annual contracts. ROA, D. # 127-10. For example, Starkey's 2016-17 contract described her "Duties" as follows:

a.  Faithfully perform all duties of a teacher in the school, using such texts as are prescribed and supplied;
b.  Be accountable to the principal for curricular plans;
c.  Observe proper decorum as befits the profession;
d.  Observe the regulations and schedules of the school, the school commission or board, and or the interparochial high school board;
e.  Continue professional growth and professional development sponsored by the archdiocesan Office of Catholic Schools;
f.  Be responsible for keeping accurate records as prescribed by the school;
g.  Make all reports required by the principal, the school commission (or board), and laws of Indiana; and
h.  Maintain licensure and renewal as needed.

ROA, D. # 127-10 at 19.

In February 2016, three months before the Archdiocese and its lawyers deemed counselors not to be ministers, Roncalli introduced an addendum to teacher contracts entitled "Ministry Description." ROA, D. # 127-8 at 2; ROA, D. # 114-2 at 524-527. Roncalli placed this addendum in the teachers' mailboxes. ROA, D. # 127-6, Phillips Aff. at 2. Charisse Phillips (a non-Catholic teacher at Roncalli) expressed discomfort at signing the addendum, but signed it as a condition of keeping her job. *Id.* at 1-2.

In May 2017, for the first time, Roncalli required Starkey to sign a "Teaching Ministry Contract" for the 2017-18 school year. ROA, D. # 127-15. The "Duties" and

other provisions in the new contract remained substantially unchanged (other than the change in title) from the prior year and identified no specific ministerial functions for Starkey. ROA, D. # 127-15 at 1-2; ROA, D. # 127-10 at 19-20.

In May 2018, Roncalli introduced new contracts for guidance counselors that included "Ministry" in the title. ROA, D. # 127-3, Currens Aff. at 3; ROA, D. # 127-16. Other than the change in title, the substantive terms of the contract once again did not change. ROA, D. # 127-16 at 1-2. The contract took effect at the beginning of the 2018-19 school year. ROA, D. # 127-16 at 1.

Also in May 2018, Roncalli introduced a "Ministry Description" for School Guidance Counselors. ROA, D. # 114-2 at 14-17. The document described guidance counselors as "minister[s] of the faith." *Id.* at 14. The document's description of a majority of the guidance counselor's "Roles" remained secular. *Id.* at 14-17 (describing roles, including "Designs and Plans the School's Guidance Curriculum and Programming," "Implements and Manages the Schools Guidance Curriculum and Programming;" "Assesses and Communicates Results;" "Develops and Maintains a Positive Learning Environment;" "Professional Growth and Development;" "Additional Professional Responsibilities;" and "Communication and Interpersonal Effectiveness."). The description identified one religious role, "Facilitates Faith Formation." *Id.* at 14. The document included "Ministerial Expectations" that said, "[d]isplay of Gospel values, good judgment, diplomacy, and the safeguarding of confidential information are required," and "[has] the potential and talent to be an effective Catholic school guidance counselor." *Id.* at 17. The

Ministry Description did not require any specific religious-related training. *Id.* The description further said: "Catholic schools are ministries of the Catholic Church, and school guidance counselors are vital ministers sharing the mission of the Church. School guidance counselors are expected to be role models and are expressly charged with leading students toward Christian maturity and with teaching the Word of God." *Id.*

Roncalli required Starkey and the other guidance counselors to sign the new contracts as a condition of keeping their jobs, without any opportunity to negotiate their terms. ROA, D. # 127-1, Starkey Dep. at 192-193; ROA, D. # 127-3, Currens Aff. at 3. Following introduction of the ministry contracts and descriptions, Starkey and the other counselors did not perform their responsibilities differently. ROA, D. # 127-1, Starkey Dep. at 193; ROA, D. # 127-3, Currens Aff. at 3. No one at Roncalli held Starkey accountable to the new language or asked Starkey whether she was following the Church's teachings. ROA, D. # 127-1, Starkey Dep. at 193-194. Roncalli provided Starkey with no religious education or training in connection with the changes to her contract or description. ROA, D. # 127-1, Starkey Dep., 193.

### E. Roncalli Non-Renews Starkey and Tries to Replace Her.

In May 2019, Roncalli notified Starkey that it would not renew her contract for the next school year. ROA, D. # 27-11. Roncalli wrote that her "civil union is a violation of [her] contract and contrary to the teachings of the Roman Catholic Church." *Id.* After that, the Archdiocese posted an opening for a guidance counselor position at Roncalli for 2019-2020. ROA, D. # 127-11 (Non-Renewal Letter); ROA, D.

# 127-12 (Job Posting). The Archdiocese's Office of Catholic Schools' online teacher application stated:

> In compliance with federal and state equal opportunity laws, qualified applicants are considered for all positions without regard to race, color, sex, national origin, age, marital status, ancestry, or the presence of a disability, which with or without reasonable accommodation does not impair performance of essential job duties. Employment is dependent on the results of a background check.

ROA, D. # 127-13 at 6.

Starkey now works as a guidance counselor at a public high school. ROA, D. # 127-1, Starkey Dep. at 191. Starkey's job duties at her current job are little different from her job duties at Roncalli (other than the administrative responsibilities she performed as Co-Director of Guidance). ROA, D. # 1217-1, Starkey Dep. at 191-192.

## SUMMARY OF THE ARGUMENT

The District Court erred by finding that Starkey was a minister as a matter of law. The District Court did not accept as true Starkey's evidence that her responsibilities at Roncalli were academic and secular, not ministerial. Instead, the District Court weighed the evidence. The Court below extended unwarranted deference to Defendants' assertions that Starkey performed religious functions at Roncalli and dismissed Starkey's contrary evidence directly refuting each of Defendants' assertions.

The Supreme Court has explained that the determination of whether an employee is a minister is fact-sensitive and must be examined on a case-by-case basis. *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 196 (2012). "What matters, at bottom, is what an employee does." *Our Lady of*

*Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020). Underlying the Supreme Court's jurisprudence on the ministerial exception is the understanding that an employee may perform some religious duties and not be deemed a minister. To rise to the standard for a minister, an employee's religious functions must be, at a minimum, significant, sustained and transparent. Moreover, courts must examine whether a religious employer's assertion that an employee is a minister is pretextual. *Sterlinski v. Catholic Bishop of Chicago*, 934 F.3d 568, 572 (7th Cir. 2019). Importantly, contrary to the District Court's approach here, the ordinary summary judgment standard applies with full force to Defendants' efforts to invoke the ministerial exception. The District Court was still required to view the facts, and all reasonable inferences to drawn therefrom, in Starkey's favor.

Starkey presented voluminous material evidence that what she did at Roncalli was academic and administrative, not ministerial. As guidance counselor, Starkey helped students to enroll in classes, apply to college or pursue a career. Starkey is not a practicing Catholic. She did not teach religion as a counselor, did not discuss the Catholic faith with students and did not pray during meetings with students. Starkey could recall two occasions over her 39-year tenure at Roncalli when she offered a morning prayer over the public address system, an activity that students would routinely perform. Starkey's responsibilities as co-director of guidance, likewise, were administrative, operational, and fiscal. As a member the Administrative Council, Starkey offered input on the nuts-and-bolts, day-to-day operations of Roncalli as her department's Co-Director. On the unusual occasion

that the Administrative Council discussed religious issues, Starkey deferred to others on the Council who were more qualified than she to provide input, such as the Chaplain or the Director of Campus Ministry.

Defendants, moreover, admitted, in writing, that Starkey was not a minister. In May 2016, the Archdiocese sent an email to Roncalli's human resource director stating: "We heard from the attorney today. School counselors and social workers do not meet the definition for the ministerial exception." This admission, by itself, should have been sufficient to preclude summary judgment.

Starkey also presented material and reinforcing evidence that Starkey's 2017 employment contract and 2018 Ministry Description, both of which seek to label Starkey as a minister, were pretextual. Firstly, Roncalli's timing for introducing these two documents creates an inference of pretext. For Starkey's first 18 years as a guidance counselor and 9 years as co-director of guidance, Roncalli never suggested to Starkey—on paper or in person—that she was minister. Secondly, Roncalli's conduct toward Starkey after Roncalli introduced these documents creates an inference of pretext. Roncalli did not discuss the documents with Starkey, did not provide religious training to Starkey on how to perform her purported new duties, and did not ask her to perform her job differently. Thirdly, Starkey's conduct creates an inference of pretext. After Roncalli introduced these documents, Starkey made no changes to how she performed her responsibilities. Fourthly, until the day Roncalli declined to renew Starkey's employment contract, Roncalli never suggested to Starkey that she was failing to perform her alleged

ministerial functions and never attempted to hold her accountable for the language in the documents. Fifthly, Defendants' May 16 email admission that guidance counselors are not ministers creates an inference of pretext. Defendants' email is evidence of their state of mind. The email creates a reasonable inference that Defendants did not believe Starkey was a minister.

Starkey held no formal religious title within the Catholic Church. Starkey's title of "Co-Director of Guidance" carries no religious connotation. Starkey did not hold herself out as a minister. In short, Starkey presented material facts that her duties at Roncalli were secular, that she performed no important religious functions, and she did not present herself, in title or in substance, as a minister. Roncalli's roll out of new contract language resulted in no change to Starkey's job – which she continues to perform – without change – at her public high school.

Starkey's evidence disputes every fact, or the inferences drawn from a fact, that the District Court relied on to conclude that Starkey is a minister as a matter of law. The District Court rested its ruling predominately on the 2017 employment contract and 2018 Ministry Description. Starkey's evidence shows that those two documents are not an accurate description of what Starkey actually did or what Roncalli expected her to do. In addition, Starkey presented compelling evidence that the two documents were a pretext for Defendants to evade civil rights laws. The District Court errored in accepting those documents at face value. Issues of material fact exist regarding the two documents' accuracy and honesty. Starkey demonstrated that she did not work as a minister.

Aside from the 2017 employment contract and the 2018 Ministry Description, the District Court points to a smattering of inconsequential religious activities in which Starkey was purported to have engaged. Starkey refutes each item the District Court cites. But even if Starkey were to have performed these activities, they do not rise to the level of significance and frequency to cause Starkey to be deemed a minister. The District Court erred in concluding these facts were undisputed and in finding them to satisfy the exacting legal standard for the ministerial exception.

The District Court further erred by entering summary judgment on Starkey's state law claims against the Archdiocese. The ministerial exception is limited to protecting employers against civil rights claims. The Archdiocese denies that it was Starkey's employer. For that reason alone, Title VII's ministerial exception does not bar Starkey's state law claims against the Archdiocese for intentional interference with a contractual relationship and intentional interference with an employment relationship.

## ARGUMENT

### I. Numerous Disputed Material Facts Preclude a Finding as a Matter of Law that Starkey Worked as a Minister at Roncalli.

#### A. This Court Reviews the Summary Judgment Decision *De Novo.*

An appellate court reviews a district court's decision on summary judgment *de novo*. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625 (7th Cir. 2011). "Summary judgment is appropriate when there are no genuine issues of material fact and judgment as a matter of law is warranted for the moving party." *Id.* at 630 (internal

citations omitted). "In assessing whether the record entitled" a movant to summary judgment, the appellate court "must examine the record in the light most favorable" to the party "against whom summary judgment was granted, resolving all evidentiary conflicts in [her] favor and according [her] the benefit of all reasonable inferences that may be drawn from the record." *Id.* . (internal citations omitted); *see also Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008) (same).

### B. The Test for the Ministerial Exception is Highly Fact Sensitive and Rests at Bottom on "What an Employee Does."

The District Court wrongly found Starkey to be a minister as a matter of law. The ministerial exception arises out of *Hosanna-Tabor*, where the Supreme Court held that the ministerial exception bars "an employment discrimination suit brought on behalf of a minister, challenging the church's decision to fire her." 565 U.S. at 196. In *Hosanna-Tabor*, the Court held that the determination of whether an employee qualifies as a minister should be made on a case-by-case basis. "We are reluctant…to adopt a rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190. The Court relied on the following factors in its analysis: "the formal title…the substance reflected in that title, her own use of that title, and the important religious functions...performed for the Church." *Id.* at 192. Whether an employee is a minister is "subject to a fact-intensive analysis" and "usually such questions are left for a jury." *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 658 (7th Cir. 2018).

The Supreme Court revisited the ministerial exception in *Our Lady of Guadalupe*. 140 S. Ct. at 2055. *Our Lady of Guadalupe* held that the disability

discrimination and age discrimination claims of two fifth grade Catholic elementary teachers who taught religion classes were barred by the ministerial exception. *Id.* at 2067. The Court again emphasized that there is no rigid test to determine whether the ministerial exception applies. *Id.* at 2069. Rather, *Our Lady of Guadalupe* focused on the actual conduct of the teachers. To that end, the Court stressed that these teachers were their students' primary teachers of religion. *Id.* at 2066. *See also id.* at 2059 ("Like Morrissey-Berru, Biel instructed her students in the tenets of Catholicism"); *Id.* at 2066 ("As elementary school teachers responsible for providing instruction in all subjects, *including religion*, they were members of the school staff who were entrusted most directly with the responsibility of educating their students *in the faith.*") (emphasis added); *Id.* at 2067 ("[T]hey were their students' primary teachers of religion. The concept of a teacher *of religion* is loaded with religious significance.") (emphasis added). The Court concluded that "[w]hat matters, at bottom, is what an employee does." *Id.* at 2064.

Underlying the Court's reasoning in *Hosanna-Tabor* and *Our Lady of Guadalupe* is the recognition that a religious institution's employee may participate in some religious activity and not be deemed a minister. To satisfy the standard of a minister, an employee's religious activity must rise to a significant level. This common-sense understanding finds voice in *Hosanna-Tabor*'s focus on the importance, frequency, and transparency of the employee's religious activities. The Court credited that the employee performed "important" religious functions, did so regularly, called herself a "minister," and held herself out to the public as a

minister. *Hosanna-Tabor*, 565 U.S. at 191-192. Similarly, in *Our Lady of Guadalupe,* the Court emphasized the teachers did not merely teach religion. Rather, they were the students' "primary teachers of religion," a responsibility "loaded with religious significance." *Our Lady of Guadalupe,* 140 S. Ct. at 2067. The test for the ministerial exception is not rigid. But to rise to the level of a minister, an employee must at a minimum perform important, sustained, and public religious functions. *See also Herx v. Diocese of Fort Wayne-South Bend Inc.*, 48 F. Supp. 3d 1168, 1177 (N.D. Ind. 2014) ("Labeling Mrs. Herx a 'minister' based on her attendance and participation at prayer and religious services with her students, which was done in a supervisory capacity, would greatly expand the scope of the ministerial exception...."); *Billard v. Charlotte Catholic High School*, No. 3:17-cv-00011, 2021 U.S. Dist. LEXIS 167418, *47( W.D. N.C. Sept. 3, 2021) ("Unlike the three teachers in *Hosanna-Tabor* and *Our Lady of Guadalupe*, Plaintiff did not teach religion in his classes and was not tasked with preparing students for participation in Catholic worship services."); *Richardson v. Northwest Christian Univ.*, 242 F. Supp. 3d 1132, 1145 (D. Ore. 2017) ("any religious function was wholly secondary to her secular role: she was not tasked with performing any religious instruction and she was charged with no religious duties such as taking students to chapel or leading them in prayer."); *De-Weese Boyd v. Gordon College*, 163 N.E.3d 1000, 1016 (Mass. S. Ct. 2021) ("Her responsibility to integrate the Christian faith into her teaching, scholarship, and advising was different in kind, and not degree,

from the religious instruction and guidance at issue in *Our Lady of Guadalupe* and *Hosanna-Tabor*.").

The summary judgment standard does not change when a religious employer seeks to invoke the ministerial exception. In deciding if issues of material fact exist as to whether an employee is a minister, the Court must still accept the non-moving party's facts as true and draw all reasonable inferences in her favor. *See, e.g., Grussgott*, 882 F.3d at 657 ("*even taking Grussgott's version of the facts as true*, she falls under the ministerial exception…") (emphasis added); *Herx*, 48 F. Supp. 3d at 1171 (N.D. Ind. 2014) (reciting usual summary judgment standard and denying summary judgment on ministerial exception's applicability); *Sterlinski v. Catholic Bishop of Chi.*, 319 F. Supp. 3d 940, 943 (N.D. Ill. 2018), *affirmed*, 934 F.3d 568 (7th Cir. 2019) (reciting summary judgment standard and evaluating ministerial exception's applicability); *Billard*, 2021 U.S. Dist. LEXIS 167418 at **15-16 (denying ministerial exception applicability on cross-motions for summary judgment); *Aparicio v. Christian Union*, 18-CV-0592, 2019 U.S. Dist. LEXIS 55938, *19 (S.D. N.Y. March 29, 2019) ("viewing the facts in light most favorable to Plaintiff, the Court finds that Plaintiff is not a "minister"…); *Bohnert v. Roman Catholic Archbishop of San Francisco*, 136 F. Supp. 3d 1094, 1114-1115 (N.D. Cal. 2015) ("The facts support Bohnert's argument that she was not a minister for the purposes of her Title VII claim. At the very least, the determination of whether the 'ministerial exception' applies depends on numerous factual determinations…[.]").

*De-Weese Boyd*, 163 N.E.3d at 1018 (concluding that assistant professor of social work was not a minister on cross-motions for summary judgment).

Moreover, courts should examine whether a religious employer's assertion that an employee is a minister is pretextual. *Sterlinski*, 934 F.3d 568, 571 (7th Cir. 2019). The religious employer's categorization of an employee as a minister must be "honest." *Id.* In determining where "to draw the line between judicial abnegation…and independent judicial resolution of ecclesiastical issues," this Court explained:

> The answer lies in separating pretextual justifications from honest ones. In normal Title VII litigation a court does not start with the question of whether the discharge or other adverse action was caused by prejudice. It waits for the employer to articulate a reason for the discharge and then asks whether that reason is pretextual – in other words, whether it is honest. If the court finds that the reason is honest, it does not answer whether the reason is *correct* – it is enough that the employer believes its own reason in good faith. And the burden of showing pretext rests with the plaintiff. [citations omitted]. A church claiming "minister" status for bus drivers would invite a finding of pretext, but a church claiming that persons who chant, sing, or play music during a service perform religious functions is on solid ground.

*Sterlinski*, 934 F.3d 568, 571 (7th Cir. 2019) (emphasis in original). Here, Starkey's evidence, and the reasonable inferences drawn therefrom, establish that Starkey was not a minister.

### C. Starkey Presented Ample Facts that Her Work at Roncalli Was Not Ministerial.

#### 1. Starkey's Work at Roncalli Did Not Make Her a Minister.

Starkey presented considerable material evidence that what she did at Roncalli was secular. *Our Lady of Guadalupe*, 140 S. Ct. at 2064. Starkey also presented material evidence that she did not perform "important religious functions."

22

*Hosanna-Tabor*, 565 U.S. at 192. Starkey presented an email from Defendants' human resources department citing to their attorneys' opinion and advice that guidance counselors are not ministers. ROA, D.#127-8 at 2. Notably, neither the District Court nor Defendants have cited a case where a guidance counselor or co-director of guidance was found to be a minister.

### i. Starkey Performed No Important Religious Functions as a Guidance Counselor.

Starkey's responsibilities as guidance counselor were secular. Indeed, Starkey presented evidence that her responsibilities as a guidance counselor at Roncalli varied minimally from what she now does as a guidance counselor at a public high school. Starkey's guidance counselor responsibilities at Roncalli were to schedule students for classes, assist students with college applications and planning, provide students with SAT and ACT test preparation tools, administer AP exams, and provide students with career guidance. ROA, D. # 127-3, Currens Aff. at 1-2; *see also* ROA, D. # 114-2 at 102-103. Each student met with a guidance counselor at least once a year. ROA, D. # 127-1, Starkey Dep. at 58. Starkey's meetings with students were academic, not religious. ROA, D. # 127-1, Starkey Dep. at 57-58. When a student came to Starkey with non-academic issues, such as depression, suicide, or self-harm, Starkey would refer the student to the Social Worker most of the time. ROA, D. # 127-1, Starkey Dep. at 51-54.

As a guidance counselor or co-director, Starkey did not pray or lead prayers with students. ROA, D. # 127-1, Starkey Dep. at 178, 189; ROA, D. # 127-22 at 5. The sole exception is when the principal asked Starkey to give the morning prayer over

the public address system. ROA, D. # 127-1, Starkey Dep. at 155-157, 189. Starkey identified two occasions where she did this – once in 2014, and once in 2016. *Id.* But she did so no more than a "handful" of times during her entire 39-year career at Roncalli. *Id.* Roncalli allowed a broad range of persons to lead morning prayer, including students. ROA, D. # 127-1, Starkey Dep., 155-156, 190-191; ROA, D. # 114-2 at 25.

Starkey's responsibilities at Roncalli vary wildly from those of the teachers in *Our Lady of Guadalupe*. Unlike Starkey, the teachers in *Our Lady of Guadalupe* instructed elementary students in Catholic faith formation, and, most importantly, were their students' "*primary* teacher of religion." 140 S. Ct. at 2067 (emphasis added). As a counselor, Starkey did not teach religion at all, much less was she the Roncalli student's "primary" teacher of religion. *Our Lady of Guadalupe* contradicts the District Court's finding that Starkey was a minister as a matter of law.

### ii. Starkey Performed No Important Religious Functions as Co-Director or a Member of the Administrative Council.

Starkey also presented material evidence that her work as Co-Director of Guidance did not make her a minister. According to Roncalli's job description, the Co-Director of Guidance: (1) coordinates with the Assistant Principal for Academic Affairs the administration of student standardized testing; (2) determines and publishes a yearly counseling program calendar; (3) develops and maintains a public relations program; (4) serves as a liaison between the guidance department and the administration; (5) develops and supervises the departmental budget; (6) participates in the performance appraisal of department members; and (7) serves as

a member of the Administrative Council and Student Assistance Program. ROA, D. # 127-14. None of these duties express or imply that the Co-Director of Guidance performs "important religious functions" for Roncalli. Rather, Starkey presented evidence that her work as Co-Director of Guidance encompassed no meaningful religious responsibilities. ROA, D. # 127-1, Starkey Dep. at 32-34. Starkey's responsibilities were administrative, operational, logistical, and financial, not ministerial.

That includes Starkey's role as a member of the Administrative Council. The Administrative Council was comprised of personnel who held formal religious titles (Vice President for Mission and Ministry, Director of Campus Ministry, and Chaplain) and personnel who did not (Assistant Principals, Dean of Students, Athletic Director, and Co-Directors of Guidance). ROA, D. # 127-1, Starkey Dep. at 34; ROA, D. # 114-2 at 22. The evidence demonstrates that the Administrative Council discussed a wide variety of matters involving the day-to-day, nuts-and-bolts operations of the school, the vast majority of which were not religious. *See, e.g.*, ROA, D. # 114-2 at 484-485 (lockdown simulation), 489-490 (cell phone and smart watch policy), 504 (semester exams), 507 (extracurricular participation survey), 508 (report cards), 509 (Latino outreach), 512 (ISTEP testing), 515 (transportation), 517 (freshman parents meeting). On those occasions that the Administrative Council did discuss topics with a religious component, Starkey deferred to other members of the Administrative Council who had religious responsibilities at Roncalli, such as the Director of Campus Ministry or Chaplain, to address those topics. ROA, D. # 114-2

at 297-298, 350 (Starkey Dep. at 41-42, 94). Starkey "would have nothing to say" about religious components of an event. ROA, D. # 114-2 at 350 (Starkey Dep. at 94). *See Bohnert*, 136 F. Supp. 3d at 1114 (emphasizing that biology teacher "assisted with the logistics of students trips and helped facilitate the programs," and that she was "not one of" the teachers that "led prayers or focused on spiritual outreach"). Starkey did not serve on the President's Council, which has direct responsibility for Roncalli's "mission." ROA, D. # 114-2 at 23. Roncalli does not list the Guidance Co-Director as a "Faith Community" leader in the Faculty Handbook, unlike other persons who serve on the Administrative Council. ROA, D. # 114-2 at 80-81, 83-4, 87, 93, 98-100. The evidence, viewed in a light most favorable to Starkey, and drawing all reasonable inferences in her favor, demonstrates that Starkey's actual work on the Administrative Council was secular, and on the minority of occasions that the Council discussed issues connected to religion, other members of the Council took responsibility for the religious matters.

Starkey's evidence demonstrates that she did not perform important religious functions as Co-Director of Guidance, or as a guidance counselor. The District Court should not have applied the ministerial exception to her, and its order should be reversed.

### 2. The Archdiocese Admitted that Counselors Were Not Covered by the Ministerial Exception.

In May 2016, the Archdiocese, acting on the advice of legal counsel, concluded that school counselors did not qualify as ministers. ROA, D. # 127-8 at 2. The Archdiocese sent an email to the Human Resources Director at Roncalli stating:

"We heard from the attorney today. School counselors and social workers do not meet the definition for the ministerial exemption." ROA, D. # 127-8 at 2. This admission should have been sufficient, by itself, to allow Starkey's claims to survive summary judgment. *See Sterlinski*, 934 F.3d at 571; *Silva v. Wisconsin*, 917 F.3d 546, 563 (7th Cir. 2019) ("As a general rule, a reasonable trier of fact can infer pretext from an employer's shifting or inconsistent explanations.") (quoting *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015)).

That the Archdiocese's email was in the context of the Fair Labor Standards Act ("FLSA"), rather than Title VII, does not reduce the evidentiary force of its admission. Courts applying the ministerial exception in FLSA cases have looked to Title VII ministerial exception cases for guidance. *See, e.g.*, *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 306 (4th Cir. 2004). Therefore, the fact that the Archdiocese was reviewing its obligations under FLSA, as opposed to Title VII, makes no difference here. The Archdiocese and its lawyers were certainly aware of the broader implications of the applicability of the ministerial exception beyond the FLSA.

Nor can the Archdiocese's admission be considered improper "expert" evidence on an ultimate legal issue. *See Grussgott*, 882 F.3d at 661-662 (affirming district court's refusal to consider declaration from expert witness conveying legal opinion as to whether ministerial exception applied). In *Grussgott*, the plaintiff submitted a declaration from an expert witness. *Id.* at 657. Starkey did not rely on an independent expert's interpretation of the ministerial exception, but the

Archdiocese's own conclusions of the ministerial exception, as conveyed by the Archdiocese's agent or employee within the scope of that relationship or employment.

Defendants argued below that Starkey opposed this conclusion and advocated against it. ROA, D. # 114-1 at 34. But the undisputed facts are that Starkey did not seek to be recognized as a minister or hold herself out as one. Instead, Starkey sought to ensure on behalf of her departmental employees, in the context of changing FLSA requirements, that counselors would remain salaried employees with annual contracts. Starkey was advocating for the compensation and job security for staff in her department. ROA, D. # 127-1, Starkey Dep. at 107-108, 113-114. Starkey's efforts to protect her departmental employees does not diminish the evidentiary value of the Archdiocese's admission.

### 3. Starkey Presented Evidence that Her New Contract and Ministry Description Labeling Starkey as a Minister Were a Pretext.

Starkey presented material and reinforcing evidence that Defendants introduced her 2017 employment contract and 2018 Ministry Description as a pretext to build legal protections for themselves. Starkey's evidence is that Defendants did not hold an honest belief that Starkey had suddenly become a minister when she was not even a practicing Catholic. ROA, D. #127-1, Starkey Dep. at 187. At a minimum, Starkey's evidence cumulatively creates a reasonable inference that Defendants' newly minted contract and job description were pretextual. *See Sterlinski*, 934 F.3d at 571 (courts may separate "pretextual justifications from honest ones").

First, Roncalli's timing in introducing these documents to Starkey is evidence of pretext. During Starkey's first 18 years as a guidance counselor, Roncalli presented to Starkey no contracts or documents stating that she was a minister. For example, Starkey's contracts from 2007 until 2017 were titled "School Teacher Contract." ROA, D. # 127-10. Similarly, during those 18 years, no one at Roncalli ever suggested to Starkey that she was a minister. ROA, D. # 127-1, Starkey Dep. at 188. Not until May 2017 did Roncalli present Starkey with a new contract titled "Teaching Ministry Contract." ROA, D. # 127-15. Similarly, Roncalli did not introduce Starkey's Ministry Description until 2018. ROA, D. # 114-2 at 14-17.

Second, Roncalli's conduct after it introduced Starkey's new contract and Ministry Description creates an inference of pretext. Roncalli had no conversations with Starkey about the meaning of these documents. Roncalli did not tell Starkey that she now had new or different responsibilities as a minister. ROA, D. # 127-1, Starkey Dep. at 188. Roncalli did not provide Starkey with any education or training on the ministerial responsibilities that Roncalli purportedly demanded from her. ROA, D. # 127-1, Starkey Dep. at 192-194. And, all of these things happened before the May 2016 determination by the Archdiocese's lawyers that counselors are not ministers.

Third, Starkey's conduct creates an inference of Defendants' pretext. After Starkey signed her contract in 2017 and was provided the Ministry Description in 2018, nothing changed about Starkey's actual work at Roncalli. Her work remained

unaltered and secular. Roncalli's written documents had no impact on Starkey's day-to-day responsibilities. ROA, D. # 127-1 at 192-194.

Fourth, Roncalli's reaction to Starkey's job performance is further evidence of pretext. Roncalli never admonished Starkey for failing to conform to the documents' supposed altered expectations. Roncalli did not place Starkey on a performance improvement plan. Roncalli never hinted to Starkey that she was failing to follow the dictates of her new contract or Ministerial Description. Not until the moment Roncalli declined to renew Starkey's contract did Roncalli make any express demands that Starkey adhere to the religious duties outlined in these documents. ROA, D. # 127-1 at 192-194. If Roncalli's written expectations for Starkey were honest, Roncalli should have made at least some minimal effort to hold Starkey accountable. *Sterlinski*, 934 F.3d 568, 571 (7th Cir. 2019).

Fifth, the Archdiocese's email admitting that counselors are not ministers creates an inference of pretext. ROA, D. #127-8 at 2. The inference of pretext against Defendants is particularly warranted, given that the Archdiocese's admission is reinforced by Roncalli's conduct toward Starkey. The Archdiocese stated that Starkey was not a minister and Roncalli did not treat Starkey as a minister, except belatedly on paper. Defendants' admission is undoubtably evidence of Defendants' state of mind. The email creates a reasonable inference that Defendants did not honestly believe that Starkey was a minister. Although the email is not binding on this Court on ultimate questions of law, the email is probative evidence of pretext.

Finally, the Archdiocese's online job application adds more evidence of pretext.

ROA, D. # 127-13. That posting included the following:

> In compliance with federal and state equal opportunity laws, qualified applicants are considered for all positions without race, color, sex, national origin, age, marital status, ancestry, or the presence of a disability, which with or without reasonable accommodation does not impair performance of essential job duties. Employment is dependent on the results of a background check.

ROA, D. # 127-13 at 6. Implicit in this posting is that the Archdiocese does not believe the ministerial exception exempts Defendants from complying with Title VII in its hiring of guidance counselors. In its posting, the Archdiocese assures prospective job applicants and the public that Defendants will not violate a guidance counselor's civil rights. Defendants' posting cannot be squared with its conduct toward Starkey.

In short, Starkey presented material evidence that, when viewed in her favor, creates a reasonable inference that her 2017 contract and 2018 Ministry Description were pretextual. Based on Starkey's evidence, if Starkey was a minister, it was on paper only, not in substance. Roncalli's two documents neither accurately nor honestly describe Starkey's responsibilities or Roncalli's expectations. In reality, Roncalli did not ask and did not expect Starkey to perform ministerial functions. Roncalli's two documents conflict sharply with both Starkey's and Roncalli's conduct.

#### 4.  No Other *Hosanna-Tabor* Factors Apply.

Starkey does not meet any of the other *Hosanna-Tabor* or *Our Lady of Guadalupe* factors for the ministerial exception. *Hosanna-Tabor*, 565 U.S. at 192

("the formal title…the substance reflected in that title, [and] her own use of that title"). Firstly, Starkey did not hold a formal title within the Catholic Church. ROA, D. # 127-1, Starkey Dep. at 187. The District Court suggested that the title "[Co-] Director of Guidance" includes religious connotations. ROA, D. # 141 at 17-18. But this cannot be correct. The Co-Director of Guidance is common title for the head of a guidance counseling department, whether the school is public or private, secular or religious. The "guidance" that counselors provide is academic. ROA, D. # 127-1, Starkey Dep. at 191. No religious title can be inferred from Co-Director of Guidance.

Second, the substance reflected in her title of Co-Director of Guidance demonstrates that her role was academic and secular. ROA, D. # 127-1, Starkey Dep. at 32-34; ROA, D. # 127-14. She did not receive any religious education or training to be Co-Director of Guidance. ROA, D. # 127-1, Starkey Dep. at 187-188. Unlike in *Grussgott*, where the Court found that "the substance of Grussgott's title…entails the teaching of the Jewish religion to students," Starkey did not "teach…religion to students" at Roncalli as a guidance counselor or Co-Director of Guidance. 882 F.3d at 660; ROA, D. # 127-1, Starkey Dep. at 189. Starkey also denies that she discussed "some of the most sensitive issues in a young person's life," as the District Court erroneously found. ROA, D. # 141 at 17-18. Rather, she routinely referred students to the Social Worker or Chaplain for such matters. ROA, D. # 127-1 at 51-54. More to the point, even if true, Starkey's discussing personal, "sensitive" issues is not inherently religious and often occurs at public high schools as well.

Third, Starkey never held herself out as a minister. ROA, D. # 127-1, Starkey Dep. at 188. Unlike in *Hosanna-Tabor*, she did not claim a tax allowance or deduction for being a minister. 565 U.S. at 192; ROA, D. # 127-1, Starkey Dep. at 188. There is no evidence that Starkey participated in a "Commissioning" or "call and response" during Faculty Day of Reflection. She does not recall doing so and Roncalli has no evidence that she attended. ROA, D. # 127-1, Starkey Dep. at 184; ROA, D. # 127-24; ROA, D. # 114-2 at 26. Other counselors and teachers did not recall participating in a Commissioning either. ROA, D. # 127-3, Currens Aff. at 3; ROA, D. # 127-5, Meyer Aff. at 2; ROA, D. # 127-6, Phillips Aff. at 1-2; ROA, D. # 127-7, Dunham Aff. at 1. Although Defendants claimed that attendance was "required" for teaching and guidance staff, Roncalli excused counselors, because they had appointments with seniors, transfer students, and parents that conflicted with the events. ROA, D. # 127-23 at 6; ROA, D. # 127-3, Currens Aff. at 3-4; ROA, D. # 127-5, Meyer Aff. at 2; ROA, D. # 114-2 at 26.

In short, Starkey's evidence that her responsibilities at Roncalli were not ministerial is material and voluminous.

## II. Ignoring the Summary Judgment Standard, the District Court Weighed Disputed Evidence in Favor of Defendants.

Although the District Court recited the summary judgment standard correctly, the Court failed to follow it. ROA, D. # 141 at 7-8. Starkey presented evidence that disputes every material fact that the District Court relied on to find that Starkey was a minister as a matter of law.

## A. Starkey's New Contract and Ministry Description Did Not Accurately Define Her Job Responsibilities and Starkey Presented Evidence that Those Documents Are Pretextual.

The District Court relied predominately on the language in Starkey's 2017 employment contract and 2018 Ministry Description. ROA, D. # 141 at 11-12. The District Court quotes generously from these two documents, deferring to them as defining accurately Starkey's job responsibilities and Roncalli's expectations. In at least two respects, the District Court erred in finding that the language in these documents is undisputed. Firstly, as *Our Lady of Guadalupe* makes clear, the pivotal factor in determining whether Starkey was a minister is what she did, not what Roncalli wrote on two pieces of paper that she allegedly should have done. *Our Lady of Guadalupe*, 140 S. Ct. at 2064. The two documents tell us nothing about Starkey's and Roncalli's actual conduct. On this factor, the facts are in irreconcilable dispute. Starkey presented comprehensive, material evidence that her responsibilities were secular and that Roncalli never asked her to perform differently. Starkey's evidence and Roncalli's two documents do not match.

Secondly, as discussed above, Starkey presented considerable material evidence that Roncalli's two documents are a pretext for Defendants to evade federal civil rights laws. Starkey's evidence of pretext, and the reasonable inferences to be drawn therefrom, create issues of material fact as to whether the two documents accurately and honestly define Starkey's responsibilities and Roncalli's expectations.

A religious institution cannot trigger the ministerial exception by the simple expediency of drafting contracts or job descriptions that insert such terms as

"minister," "mission" or "religion," but otherwise ignore those terms. An approach

that elevates form over substance would give religious employers wide discretion to

designate broad categories of secular employees as ministers. The District Court's

analysis could have sweeping implications for employees of religious institutions,

such as schools, healthcare systems and universities. Private religious schools alone

employ in the United States over 335,000 full-time teachers. National Center for

Education Statistics Universe Survey, Private Schools, 2017-18, *available at*

http://nces.ed.gov/surveys/pss/tables/TABLE02fl1718.asp

(last visited Oct. 26, 2021). Such as approach has been rejected by *Hosanna-Tabor*

and *Our Lady of Guadalupe*, which require a searching, substantive and fact-

intensive analysis designed to uncover "what an employee does." *Our Lady of*

*Guadalupe,* 140 S. Ct. at 2067. As Circuit Judge Hamilton recently observed:

> Lawyers for [religiously affiliated] employers have been offering public advice
> about how to try to expand the reach of the ministerial exception as far as
> possible. One group advises, for example: "by distributing religious duties to
> as many staff members as is reasonably appropriate, a religious
> organization *can increase the perception that employees who have those*
> *duties are ministers*. Assigning employees responsibilities in prayer and
> devotions, including leading staff devotional studies, or responsibilities to
> provide congregational/member care, move those employees toward the
> 'minister' end of the spectrum." Donn C. Meindertsma, *Employment Law for*
> *Ministries*, Conner Winters (Mar. 2019), https://www.cwlaw.com/newsletters-
> 40 (last visited July 8, 2021) (emphasis added). Another group advises that
> all employee agreements and handbooks state that the "organization's core
> mission includes the promotion, development, or education of religion," and
> that "Employees of the organization have a vital duty to aid in the promotion
> and development of the organization's core mission." Gordon Behr, *Hiring*
> *and Firing in Religious Organizations: The Ministerial Exception*,
> MauckBaker (Sept. 8, 2020), https://www.mauckbaker.com/post/hiring-and-
> firing-in-religious-organizations-the-ministerial-exception (last visited July 8,
> 2021).

*Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 995 (7th Cir. 2021) (Hamilton, J., dissenting) (emphasis in original). Here, the District Court wrongly accepted the two documents at face value. The District Court's deferential reliance on Starkey's 2017 employment contract and 2018 Ministry Description, and the Court's failure to accept as true Starkey's contrary evidence, was reversable error. *See De-Weese Boyd,* 163 N.E.3d 1000 at 1017 ("If plaintiff was a minister, it is hard to see how any teacher at a religious school would fall outside the exception.") (*quoting Richardson,* 242 F. Supp. 3d at 1145-46 (D. Ore. 2017)); *Dias v. Archdiocese of Cincinnati*, No. 1:11-cv-00251, 2013 U.S. Dist. LEXIS 12417, *9 (S.D. Ohio Jan. 30, 2013) (rejecting Defendants' "attempt to swallow up the ministerial exception by characterizing teachers generally as role models and therefore 'ministers.'").

### B. The District Court Cast Aside Starkey's Evidence to Conclude Starkey Was a Minister.

Starkey's 2017 contract and 2018 Ministry Description form the core for the District Court's erroneous conclusion that Starkey was a minister as a matter of law. Aside from those two documents, the District Court points to a mishmash of Starkey's functions that the Court finds "would not be required of a guidance counselor at a secular school." ROA, D. # 141 at 16. Starkey presented evidence that disputes each of these facts or the inferences the District Court draws from them in favor of Defendants. Equally important, the test for the ministerial exception certainly does not turn on whether Starkey performed any functions that would not be required at a secular school. Even if Starkey may have performed some

incidental or inconsequential religious activities during her 39-year tenure at Roncalli, those activities did not elevate her to the level of a minister. To be deemed a minister, Starkey must have performed religious functions at Roncalli that were, at a minimum, substantial and frequent. *See Herx.*, 48 F. Supp. 3d at 1177; *Billard*, 2021 U.S. Dist. LEXIS 167418 at *47; *Richardson*, 242 F. Supp. 3d at 1145 (D. Ore. 2017); *De-Weese Boyd*, 163 N.E.3d at 1016. The facts the District Court relied on are both disputed and legally insufficient.

The District Court cited favorably to an affidavit of Angela Maly, a guidance counselor at Roncalli. ROA, D. # 141 at 7, 12-13. Maly's description of her responsibilities (and, in particular, their religious component) was vigorously disputed by Starkey and Autumn Currens, another Roncalli guidance counselor. Maly's employment began in August 2018, the final year of Starkey's employment. ROA, D. # 114-2 at 6-8. Currens worked as a counselor for many more years than Maly and Currens overlapped significantly with Starkey's time as Co-Director. In contrast to Maly's description of her job, Currens did not pray one-on-one with students and "rarely" incorporated religious beliefs or teachings into her duties. ROA, D. # 127-3, Currens Aff. at 1-3. Furthermore, Roncalli never informed Currens that she was providing insufficient religious activity in her responsibilities. ROA, D. # 127-3, Currens Aff. at 3. Accordingly, Starkey's testimony and Currens' evidence refute Defendants' claim that Roncalli expected counselors to perform significant religious functions. The conflicting affidavits between Maly and Currens, as well as Starkey's own testimony, confirm that the nature of a guidance

counselor's duties is disputed and requires resolution by a factfinder. The District Court made one brief reference to the Currens affidavit, but failed to address the numerous disputed facts and inferences from the two competing affidavits. ROA, D. # 141 at 15.

The District Court cites to Starkey's work with Roncalli's Student Assistance Program ("SAP"). ROA, D. # 141 at 12-13. This work does not suffice to convert Starkey's position into a ministerial role. *See Bohnert*, 136 F. Supp. 3d at 1114-1115 (declining to apply ministerial exception to biology teacher who was involved in "Campus Ministry Department" and was a "Retreat Director"). Starkey testified that she did not refer many students to the SAP and that when a student approached her with non-academic concerns, Starkey would send the student to the Social Worker or Chaplain instead of the SAP. ROA, D. # 127-1, Starkey Dep. at 51-54. The District Court ignored this testimony. Furthermore, it is a bridge too far to suggest, as the District Court did, that Starkey's work in helping students with "sensitive" and "personal" issues is inherently religious. ROA, D. # 141 at 13. State departments of education, school districts and public schools have student assistance programs. *See, e.g.*, Pennsylvania Department of Education, Student Assistance Program (SAP), *available at* https://www.education.pa.gov/Schools/safeschools/sap-pbis/SAP/Pages/default.aspx (describing the Pennsylvania Department of Education's "Student Assistance Program") (last visited Oct. 26, 2021); California Department of Education, Student Assistance Programs, *available at* https://www.cde.ca.gov/ls/he/at/sap.asp (providing

"information for implementing new Student Assistance Programs (SAPs) along with resources for strengthening existing SAPs") (last visited Oct. 26, 2021); Long Reach High School, Student Assistance Program, *available at* https://lrhs.hcpss.org/about/student-assistance-program (describing Student Assistance Program at public high school in Maryland) (last visited Oct. 26, 2021); Livonia Public Schools, Student Assistance Program, *available at* https://www.livoniapublicschools.org/domain/3320 (describing Student Assistance Program in Michigan public school district) (last visited Oct. 26, 2021). Factual disputes exist as to whether Starkey's involvement with an SAP makes her, as a matter of law, a minister.

The District Court seems to give weight to the fact Roncalli's principal observed that Starkey performed well in her prior roles, over 20 years ago, as a New Testament teacher and choir director and Starkey's long-expired certification as a catechist. ROA, D. # 141 at 13. Whatever Starkey's responsibilities may have been decades earlier in entirely different jobs, that hardly is relevant to what Starkey did as guidance counselor and Co-Director of Guidance for more than a decade before Roncalli fired her. This evidence cited by the District Court is factually disputed and legally irrelevant.

The District Court also cited Starkey's role as a member of the Administrative Council. ROA, D. # 141 at 14-16. As previously explained, Starkey disputes that she performed religious functions while serving on the Administrative Council. The majority the issues the Administrative Counsel discussed where secular and

Starkey limited her contributions to secular or logistical topics. ROA, D. # 114-2 at 297-298, 350 (Starkey Dep. at 41-42, 94); ROA, D. # 114-2 at 483-518. On the occasion that the Administrative Council discussed topics connected to religious matters, Starkey deferred to the other members of the Administrative Council who were qualified to address those topics. ROA, D. # 114-2 at 297-298, 350 (Starkey Dep. at 41-42, 94). Although the Administrative Council may have "planned all-school liturgies," the only evidence of Starkey's involvement related to liturgies was to suggest to religion teachers that non-Catholic freshmen may need some direction regarding the logistics of the opening school liturgy. ROA, D. # 114-2 at 657. Absent more specific, substantive, and sustained involvement with religious components, Starkey's work to assist Roncalli with logistics and facilitation of programs does not make her a minister. *See Bohnert*, 136 F. Supp. 3d at 1114.

The District Court suggested that Starkey was one of Roncalli's "select group of leaders." ROA, D. # 114-1 at 30-31. The dissent in *Our Lady of Guadalupe* agreed that the ministerial exception applied to "religious leaders," but clarified that examples would be "rabbis, priests, nuns, imams, ministers." 140 S. Ct. at 2072-73 (Sotomayor, J., dissenting). Here, the District Court went much further, determining that Starkey's "senior leadership role" made her a minister. ROA, D. # 141 at 18. Except for school principals (*see Fratello v. Archdiocese of New York*, 863 F.3d 190 (2d Cir. Cir. 2017), courts had not applied the ministerial exception to other senior administrators or department heads at a school, until the District Court's ruling here. Even if the District Court were correct that Starkey was a

"leader," Starkey's evidence demonstrates that her work remained secular. The District Court was wrong, both factually and legally, to draw the inference in favor of Defendants that a leader must be a minister.

Finally, the District Court observed Starkey "delivered the morning prayer on at least a few occasions." ROA, D. # 141 at 16. Starkey did not pray with students one-on-one. And Starkey offered the morning prayer on just two known occasions in her 39-year tenure at Roncalli. ROA, D. # 127-20; ROA, D. # 127-21. At Roncalli, the act of offering the very brief morning prayer was in no way reserved for ministers. Starkey offered evidence that a broad range of individuals routinely offered the morning prayer, including students. ROA, D. # 127-1, Starkey Dep. at 155-57, 178, 189-191; ROA, D. # 114-2 at 25. Starkey did not become a minister by offering morning prayer twice.

The District Court weighed the evidence, credited Defendants' evidence, and discounted Starkey's. The best example of this may be the District Court's dismissal, in a footnote, of Defendants' email admission that counselors are not ministers. ROA, D. # 141 at 16 n.3. The District Court compounded that error by affording undue deference to Defendants' interpretations of Starkey's responsibilities at the expense of Starkey's actual conduct. ROA, D. # 141 at 16-17. The District Court suggested that "it would be inappropriate for this court to draw a distinction between secular and religious guidance offered by a guidance counselor at a Catholic school." *Id.* at 16 (internal citation omitted). But this reasoning is at odds with the summary judgment standard. The District Court's approach elevates

the facts and inferences most favorable to the moving party at the expense of the non-moving party. This would give religious employers nearly absolute license to decide who does and does not qualify as a minister. Although two Supreme Court justices have endorsed this view, it has not been adopted by a majority of the Court. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2069 (2020) (Thomas, J., joined by Gorsuch, J., concurring).

### III. The Ministerial Exception Does Not Apply to Starkey's State Law Claims Against the Archdiocese.

Even if the Court were to decide that the ministerial exception applies (it should not), Roncalli would not be entitled to summary judgment on all of Starkey's claims. In *Hosanna-Tabor*, the Court held that the ministerial exception barred "an employment discrimination suit." 565 U.S. at 196. It "express[ed] no view on whether the exception bars other types of suits." *Id.* Starkey pursues the following claims: (1) Title VII Discrimination; (2) Title VII Retaliation; (3) Title VII Hostile Work Environment; (4) Intentional Interference with Contractual Relationship; and (5) Intentional Interference with Employment Relationship. ROA, D. # 1 at 7-12.[3] The ministerial exception does not apply to Starkey's intentional interference tort claims arising under state law.[4]

---

[3] Starkey also asserted a Title IX retaliation claim, but the Court granted Defendants' Motion for Judgment on the Pleadings with respect to that claim only, on preemption grounds. ROA, D. # 92 at 23-26.

[4] In briefing before the District Court, Starkey argued that the ministerial exception did not bar her hostile work environment claim under Title VII. ROA, D. # 126 at 26-27. Starkey is no longer pursuing this argument in light of this Court's decision in *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968 (7th Cir. 2021).

Starkey's state law business tort claims are not barred by the ministerial exception. *See Kirby v. Lexington Theol. Seminary*, 426 S.W.3d 597, 621 (Ky. 2014) ("Kirby's status as a ministerial employee does not…bar the claims in contract from proceeding."). Starkey's intentional interference claims are against the Archdiocese only, not Roncalli. ROA, D. # 1 at 11-12. The Archdiocese admits that it was not Starkey's employer at any time after 2009. ROA, D. # 20 at 1-2. If the Archdiocese is not Starkey's employer, then the ministerial exception is not a bar to Starkey's claims against the Archdiocese. *See McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 304 F. Supp. 3d 514, 519-520 (N.D. Miss. 2018) ("Accordingly…because McRaney was indisputably not employed by NAMB, this is not a claim between employer and employee…and thus the ministerial exception does not apply to mandate dismissal of any of McRaney's claims.").

In *Demkovich*, all parties conceded that the ministerial exception did not apply to civil tort claims.[5] 3 F.4th at 982 ("[A]s far as we can tell, no court has held that the ministerial exception protects against criminal or personal tort liability. Nor do we."); *Id.* at 988 (Hamilton, J., dissenting) ("[D]efendants and all members of this court agree that even ministerial employees may assert tort claims against supervising ministers and churches as institutions."). Despite this, the District Court held that the ministerial exception bars Starkey's Indiana business tort claims, reasoning that "the decision to not renew Starkey's employment contract

---

[5] Defendants' attorneys, the Becket Fund for Religious Liberty, also represented the *Demkovich* Defendants. Doc. Nos. 6-9 (Disclosure Statements and Appearances); *Demkovich*, 3 F.4th 968 (listing counsel of record).

goes to the heart of the church's right to 'select and control who will minister to the faithful.'" ROA, D. # 141 at 19 (internal citation omitted). But this framing assumes that the Archdiocese employed Starkey. The Archdiocese denies it was Starkey's employer. ROA, D. # 20 at 1-2. Starkey's intentional interference claims allege that the Archdiocese interfered with *Roncalli*'s decision to not renew Starkey's contract. Starkey has suffered harm from that third party interference.[6] Because Starkey's state law claims do not implicate a religious employer's right to select and control ministers, they do not implicate ecclesiastical matters. *See McRaney*, 304 F. Supp. 3d at 519-520. Starkey's state common law claims do not implicate ecclesiastical matters, so the ministerial exception does not apply to them. ROA, D. # 141 at 19 (*citing Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 123 (3d Cir. 2018)). The District Court committed reversable error in granting summary judgment against Starkey on her state law claims against the Archdiocese.

## CONCLUSION

Plaintiff/Appellant Lynn Starkey respectfully requests that this Court reverse the Order granting summary judgment to Defendants on all of Starkey's claims and remand the case to the District Court for further proceedings consistent with this Court's order.

---

[6] Starkey's state law claims are pled in the alternative. *See* ROA, D. # 67 at 23 n.3. For purposes of her Title VII claims, Starkey alleges that both the Archdiocese and Roncalli employed her at the time of her non-renewal, but if the Archdiocese did not employ her, her state law claims are viable. The parties have not conducted discovery related to the joint employer issue, so any determination as to whether the Archdiocese was Starkey's employer would be premature.

Dated: October 27, 2021                Respectfully submitted,

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney
Matthew R. Gutwein
Christopher S. Stake
DELANEY & DELANEY LLC
3646 N. Washington Blvd.
Indianapolis, IN 46205
(317) 920-0400

*Attorneys for Plaintiff-Appellant*
*Lynn Starkey*

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

The undersigned counsel for Plaintiff-Appellant Lynn Starkey certifies that the appendix bound with this brief contains all materials required by Circuit Rule 30(a) of the United States Court of Appeals for the Seventh Circuit. There are no record materials within the scope of Circuit Rule 30(b) that are required to be filed. No separate appendix has been filed.

Dated: October 27, 2021                Respectfully submitted,

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney

## CERTIFICATE OF COMPLIANCE WITH PAGE LIMIT, TYPEFACE, REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

Pursuant to Fed. R. App. P. 32(g), the undersigned counsel for Plaintiff-Appellant Lynn Starkey certifies that this document complies with the page limit of Circuit Rule 32 (c) because this document contains 11,723 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style

requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because this document has been prepared in a proportionally spaced typeface, using Microsoft Word, in Century 12-point font.

Dated: October 27, 2021                                       Respectfully submitted,

                                                              */s/ Kathleen A. DeLaney*
                                                              Kathleen A. DeLaney

## CIRCUIT RULE 30(a) APPENDIX

Final Judgment, August 11, 2021................................................................A1

Entry on Defendants' Motion for Summary Judgment or, in the
Alternative, Motion for Judgment on the Pleadings, August 11, 2021 ....................A2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

LYNN STARKEY,                                    )
                                                 )
                    Plaintiff,                   )
                                                 )
         v.                                      )        No. 1:19-cv-03153-RLY-TAB
                                                 )
ROMAN CATHOLIC ARCHDIOCESE OF                    )
INDIANAPOLIS, INC., and                          )
RONCALLI HIGH SCHOOL, INC.,                      )
                                                 )
                    Defendants.                  )

**FINAL JUDGMENT**

Having granted Defendants' Motion for Summary Judgment, the court now enters

Final Judgment in favor of Defendants and against Plaintiff.

**SO ORDERED** this 11th day of August 2021.

Roger A.G. Sharpe, Clerk                    RICHARD L. YOUNG, JUDGE
                                            United States District Court
BY: _____                 Southern District of Indiana
      Deputy Clerk, U.S. District Court

Distributed Electronically to Registered Counsel of Record.

A1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LYNN STARKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03153-RLY-TAB |
| | ) | |
| ROMAN CATHOLIC ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., and | ) | |
| RONCALLI HIGH SCHOOL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN
THE ALTERNATIVE, MOTION FOR JUDGMENT ON THE PLEADINGS**

Lynn Starkey worked for Roncalli High School, a private Catholic school in

Indianapolis, Indiana, for nearly forty years.  After Roncalli learned of Starkey's same sex

marriage, it declined to renew her employment contract on the grounds that her marriage

violated Catholic teachings.  At the time of her termination, Starkey worked as Co-

Director of Guidance.

Starkey sued Roncalli and the Roman Catholic Archdiocese of Indianapolis

alleging discrimination, retaliation, and hostile work environment under Title VII, and

tortious interference with contractual relationship and tortious interference with

employment relationship under Indiana state law.[1]  Roncalli now moves for summary

judgment on all of Starkey's claims by arguing that Starkey was a minister for purposes

---

[1] Starkey also asserted a Title VII retaliation claim, but the court granted Roncalli's Motion for
Judgment on the Pleadings with respect to that claim.

of the First Amendment's ministerial exception.  For the reasons that follow, the court

concludes that Starkey qualified as a minister, and that the ministerial exception bars all

of Starkey's claims.  Therefore, Defendants' Motion for Summary Judgment is

**GRANTED**.

## I.   Factual Background

The general facts of this case were outlined in this court's entry on Defendants'

Motion for Judgment on the Pleadings.  (Filing No. 93).  The court recounts only those

facts relevant to deciding the present motion.

### A.   Roncalli's Mission

Roncalli High School is a Catholic school operating "under the auspices of the

Roman Catholic Archdiocese of Indianapolis."  (Filing No. 114-2, Appendix of

Supporting Evidence ("App.") at 63-64).  According to the school's mission statement,

Roncalli pledges to "provide . . . an educational opportunity which seeks to form

Christian leaders in body, mind, and spirit."  (*Id.* at 18 ¶ 8, 63).  The school's purpose is

to "support[] and otherwise further[] the mission and purposes of" the Archdiocese.  (*Id.*

at 51).

### B.   Starkey's Employment at Roncalli

Starkey began working at Roncalli during the 1978-1979 school year, and, with

the exception of the 1981-1982 school year when she completed a master's degree in

music education, she worked there continuously until her termination in 2019.  (*Id.* at

267-68).  Starkey held several positions during her time at Roncalli, including New

Testament teacher, Choral Director, Fine Arts Chair, Guidance Counselor, and Co-

Director of Guidance. (Filing No. 127-2, List of Positions). Starkey taught New Testament from 1982 to 1989. (*Id.*). In 1985, Roncalli's chaplain told Starkey that she must apply for catechesis certification in order to continue teaching religion, so Starkey applied to become a catechist. (App. at 277). Her application was approved, but it expired in 1990. (*Id.*, 187). Starkey never renewed it. (*Id.*). From 1988 to 1998, Starkey served as Choral Director, a role which required her to prepare students for the music used during the school's monthly Mass. (List of Positions; App. at 269).

In 1997, Starkey became a guidance counselor, a position she held for ten years until she assumed the role of Co-Director of Guidance in 2007. (List of Positions). Starkey served as Co-Director of Guidance for twelve years until her termination in 2019. (*Id.*). For the final twenty-one years of Starkey's tenure at Roncalli, her role was limited to that of guidance counselor and Co-Director of Guidance. (*Id.*).

## C.    Guidance Counselor's Role at Roncalli

Teachers and guidance counselors at Roncalli are generally employed pursuant to one-year contracts. When this dispute arose, Starkey was employed under a "School Guidance Counselor Ministry Contract" and accompanying "Archdiocese of Indianapolis Ministry Description."[2] (App. at 532-33, 526). According to the contract, Starkey agreed that she would be in default if she breached any duty, which included "relationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church." (*Id.* at

---

[2] From 2007 to 2017, Starkey's contract was titled, "School Teacher Contract." (Filing No. 127-10, School Teacher Contract). Roncalli then instituted a "Teaching Ministry Contract" for the 2017-2018 school year. (App. at 530).

3

A4

533).  The Catholic Church defines marriage as a "covenant" "by which a man and a

woman form with each other an intimate communion of life and love."  Catechism of the

Catholic Church § 1660.

The contract also provided that Starkey "acknowledge[d] receipt of the ministry

description that is attached to this contract and agree[d] to fulfill the duties and

responsibilities listed in the ministry description."  (*Id.* at 532).  The ministry description

identifies a guidance counselor as a "minister of the faith" who will "collaborate with

parents and fellow professional educators to foster the spiritual, academic, social, and

emotional growth of the children entrusted in his/her care."  (*Id.* at 526).  The ministry

description further specified: "As role models for students, the personal conduct of every

school guidance counselor, teacher, administrator, and staff member, both at school and

away from school, must convey and be supportive of the teachings of the Catholic

Church."  (*Id.*).

The first "Role" identified in the ministry description is that the guidance

counselor "Facilitates Faith Formation," which included the following responsibilities:

- "Communicates the Catholic faith to students and families through implementation of the school's guidance curriculum, academic course planning, college and career planning, administration of the school's academic programs, and by offering direct support to individual students and families in efforts to foster the integration of faith, culture, and life."

- "Prays with and for students, families, and colleagues and their intentions. Participates in and celebrates liturgies and prayer services as appropriate"

- "Teaches and celebrates Catholic traditions and all observances in the Liturgical Year."

4

A5

- "Models the example of Jesus, the Master Teacher, in what He taught, how He lived, and how He treated others."

- "Conveys the Church's message and carries out its mission by modeling a Christ-centered life."

- "Participates in religious instruction and Catholic formation, including Christian services, offered at the school."

(*Id.*).  Guidance counselors were also expected to "use[] techniques and methods that foster a Christ-centered atmosphere"; "participate[] in spiritual retreats, days of reflection, and spiritual formation programs"; "proactively identif[y] and address[] physical, social, emotional, and spiritual needs of individuals and of the community of learners"; and "display [] Gospel values." (*Id.* at 527-29).  The guidance department is also the only department whose staff members meet with every student individually throughout the year. (*Id.* at 22 ¶ 29).

### D.     Starkey as Co-Director of Guidance

In her role as a guidance counselor and Co-Director of Guidance, Starkey attended monthly Masses, where she received communion and sang with the congregation.  (*Id.* at 332).  She also communicated guidance to other staff members regarding how to prepare students of different faiths for the school's Catholic liturgy.  (*Id.* at 652).  In addition to attending monthly Masses at Roncalli, Starkey attended "Days of Reflection." (*Id.* at 421).  Principal Charles Weisenbach explained that these events, which occur before each school year, are "designed specifically for [Roncalli's] faculty and have a very direct, intentional focus on [the] Catholic mission and how each [faculty member] is called to live out that mission in [their] specific roles." (*Id.* at 20 ¶ 19).  Weisenbach further

explained that these gatherings are required only for the small group of faculty members "who are impacting kids in their spiritual life on a day-to-day basis." (*Id.* ¶ 23). This included guidance counselors. (*Id.*). At these Days of Reflection, Weisenbach testified that he delivers a "call-and-response Commissioning Prayer" which "exhorts" the faculty members to embrace the Catholic ministry at the school. (*Id.*). In that prayer, the faculty state that they "accept the responsibilities of [their] ministry"; "promise to share [their] faith with others"; and "promise to form youth and support families in the faith by following the example of our Master Teacher, Jesus Christ." (*Id.* at 31). At the end of the prayer, the leader states: "I hereby commission you to faithfully and joyfully serve as ministers of the faith in the Catholic schools of the Archdiocese of Indianapolis." (*Id.*). Starkey does not recall participating in such a "call and response" during these Days of Reflection. (*Id.* at 435).

One of Starkey's responsibilities as Co-Director of Guidance was to serve on Roncalli's Administrative Council. (*Id.* at 93-95). Considered the "main leadership body" at Roncalli, the Administrative Council meets weekly and addresses the "day-to-day operations and spiritual life of the school." (*Id.* at 17-18 ¶¶ 4-5). According to Principal Weisenbach, "[m]ost faculty and staff recognize the Administrative Council as the lifeblood of decision-making at the school" and "the Administrative Council and the Department Chairs are responsible for 95% of Roncalli's daily ministry, education, and operations." (*Id.* at 18 ¶¶ 5, 7). While the Administrative Council handled the "nuts and bolts, day-to-day" operations of the school, (App. at 285-86), it also dealt with issues more closely related to Roncalli's religious mission, including logistics for all-school

liturgies and the qualifications for students to serve as Eucharistic ministers.  (*Id.* at 293, 323-24).

Prayer is a regular occurrence at Roncalli.  Administrative Council meetings generally opened with a prayer, (*see generally id.* at 483-518), and every morning different members of the Roncalli community would deliver a morning prayer over the school PA system.  (*Id.* at 406-07, 440-41).  Starkey delivered the morning prayer on more than one occasion, as did several other individuals, including the principal, the chaplain, the campus minister, and students.  (*Id.* at 406-07).  While Starkey did not otherwise lead prayer or pray with students as part of her regular duties as guidance counselor or Co-Director of Guidance, (*id.* at 440-41), other guidance counselors testified that prayer with students is a regular part of their job.  Angela Maly described her daily work as a guidance counselor as "specifically geared toward modeling and teaching not just a generic 'Christian' faith but the Catholic faith specifically."  (*Id.* at 7 ¶ 40).  To that end, Maly "pray[s] with and for [the students].  [She] join[s] with them in liturgies and prayer services. . . . And [she] tr[ies] to help them understand and be formed in the Catholic faith."  (*Id.*).  Maly explained that prayer is an "essential component[]" of her work, including the academic and career counseling aspects of her job.  (*Id.* at 2 ¶ 10).

Any additional facts necessary to resolve the motion will be addressed below.

## II.    Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'"  *Skiba v. Illinois Cent.*
*R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 248 (1986)).  The court views the facts, and draws all reasonable inferences
from those facts, in the light most favorable to Starkey, the non-moving party.  *Skiba*, 884
F.3d at 717.

## III.   Discussion

Roncalli moves for summary judgment on the grounds that Starkey was a minister
and her claims are therefore barred by the ministerial exception.  Roncalli next argues
that Starkey's federal claims are barred by the Religious Freedom Restoration Act
("RFRA").  Finally, Roncalli requests that the court reconsider its denial of Roncalli's
motion for judgment on the pleadings.  Because the court concludes that the ministerial
exception applies and bars all of Starkey's claims, the court declines to reach Roncalli's
other arguments.

### A.     The Ministerial Exception

The First Amendment provides that "Congress shall make no law respecting an
establishment of religion, or prohibiting the free exercise thereof."  The Religion Clauses
ensure that, among other things, religious institutions are free "to decide matters of 'faith
and doctrine' without government interference."  *Our Lady of Guadalupe Sch. v.*
*Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) (quoting *Hosanna-Tabor Evangelical*
*Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 194-95 (2012)).  "This does not
mean that religious institutions enjoy a general immunity from secular laws, but it does
protect their autonomy with respect to internal management decisions that are essential to

the institution's central mission.  And a component of this autonomy is the selection of the individuals who play certain key roles." *Id.*

The ministerial exception arose from this understanding of the First Amendment: "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions within churches and other religious institutions." *Our Lady of Guadalupe*, 140 S. Ct. at 2060.  *See also Hosanna-Tabor*, 565 U.S. at 188 ("Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.").  When the state interferes with these types of employment decisions, it violates both the Free Exercise and Establishment Clauses of the First Amendment.  First, "[b]y imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Id.*  Second, "[a]ccording the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.* at 188-89.

The ministerial exception is not limited to claims of religious discrimination; it bars all claims of discrimination under Title VII, including discrimination on the basis of sexual orientation. *Id.* at 188.  *See also Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) (concluding discrimination on the basis of sexual orientation is a form of sex discrimination under Title VII).  The exception also applies regardless of whether the

9

A10

reason given for the employment decision was religious in nature.  *Hosanna-Tabor*, 565

U.S. at 194-95 ("The exception instead ensures that the authority to select and control

who will minister to the faithful—a matter 'strictly ecclesiastical,'—is the church's alone."

*Id.* (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,

344 U.S. 94, 119 (1952)).  Nor is the exception limited to ordained ministers; courts have

applied the exception to an organist, *Sterlinski v. Cath. Bishop of Chicago*, 934 F.3d 568

(7th Cir. 2019), a press secretary, *Alicea-Hernandez v. Cath. Bishop of Chicago*, 320 F.3d

698 (7th Cir. 2003), and a school principal, *Fratello v. Archdiocese of New York*, 863

F.3d 190 (2d Cir. 2017).

 When the Supreme Court initially recognized the ministerial exception in

*Hosanna-Tabor*—a case involving a "called" kindergarten and fourth grade teacher at an

Evangelical Lutheran school—the Court declined to announce "a rigid formula" for

determining whether an employee falls within the exception.  565 U.S. at 190.  The court

instead identified four relevant circumstances, but did not assign any one circumstance

particular weight: (1) "the formal title" given by the church; (2) "the substance reflected

in that title"; (3) "[the teacher's] own use of that title"; and (4) "the important religious

functions she performed for the Church.  *Id.* at 192.  In light of those considerations, the

court concluded the teacher was a ministerial employee.  *Id.* at 192.

 The Supreme Court revisited the scope of the ministerial exception in *Our Lady of

Guadalupe*—a case involving discrimination claims brought by two elementary school

teachers at Catholic schools.  The Court clarified that its "recognition of the significance"

of the four factors in *Hosanna-Tabor* "did not mean that they must be met—or even that

10

they are necessarily important—in all other cases." 140 S. Ct. at 2063.  Instead, courts

must "take all relevant circumstances into account" when determining "whether each

particular position implicated the fundamental purpose of the exception." *Id.* at 2067.

"What matters, at bottom, is what an employee does." *Id.*

> **B.    Starkey's Position as Co-Director of Guidance Falls Within the
>         Ministerial Exception.**

With this framework in mind, it is apparent that the ministerial exception covers

Starkey's role as Co-Director of Guidance.  To begin, religious instruction and formation

are central to Roncalli's philosophy and mission, and Starkey's employment documents

"specified in no uncertain terms" that Roncalli expected her to perform a variety of

religious duties and to help carry out the school's mission.  *Our Lady of Guadalupe*, 140

S. Ct. at 2066.  While Roncalli's characterization of the role is not dispositive, "the

school['s] definition and explanation of the[] role[] is important." *Id.  See also Grussgott*

*v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 660 (7th Cir. 2018) ("Thus, it is the

school's expectation—that Grussgott would convey religious teachings to her students—

that matters).

The School Guidance Counselor Ministry Description designated a guidance

counselor as a "minister of the faith" and charged her with "foster[ing] the spiritual . . .

growth" of her students.  (App. at 526).  The ministry description stated that "Catholic

schools are ministries of the Catholic Church, and school guidance counselors are vital

ministers sharing the mission of the Church.  School guidance counselors are expected to

be role models and are expressly charged with leading students toward Christian maturity

and with teaching the Word of God." (*Id.* at 529). The ministry description also identified "Facilitates Faith Formation" as the guidance counselor's first "Role," which required communicating the Catholic faith to students, praying with and for members of the Roncalli community, teaching and celebrating Catholic traditions, modeling the example of Jesus, conveying the Church's message, and participating in religious instruction and Catholic formation. (*Id.*). Like the employee in *Hosanna-Tabor*, Starkey was "expressly charged", 565 U.S. at 192, with "leading students toward Christian maturity and with teaching the Word of God." (App. at 529).

Angela Maly, a current guidance counselor at Roncalli, confirmed that the ministry description "is a fair description of the day-to-day expectations of guidance counselors at Roncalli." (*Id.* at 7 ¶ 39). In fact, Shelly Fitzgerald, Starkey's Co-Director of Guidance, explained that she met with students individually "at least once a year, but often times, much more" and discussed "personal and social issues . . . and faith formation." (*Id.* at 41-42). Fitzgerald also "consistently use[d] spiritual life and resources in [her] counseling conversations as well as sharing [her] own spiritual experiences." (*Id.* at 45). She explained that "in a faith-based school," her willingness to share her beliefs and love of God "is a strength when working with young people who are seeking direction." (*Id.*).

One of the other ways in which Roncalli's guidance counselors worked with students was through the Student Assistance Program (now named STAND UP) ("SAP"). (*Id.* at 298-99; *id.* at 3 ¶ 14). SAP helps guidance counselors identify and support "at risk" students who may be struggling with issues such as dysfunction at home, the death

12

A13

of a loved one, or substance abuse.  (*Id.* at 299).  Angela Maly, who serves in a leadership role within SAP, explained that students are encouraged to reach out to SAP/STAND UP if they are struggling with "anything that may negatively affect [their] physical, social, emotional, or spiritual health."  (*Id.* at 3 ¶ 16).  Starkey confirmed that her work with SAP required her to help students with their "most sensitive" and "personal issues."  (*Id.* at 598).  In line with the expectations laid out in her employment documents and the school's mission, Roncalli plainly anticipated that matters of faith and doctrine would inform a guidance counselor's approach to working with students struggling with sensitive personal issues.

Not only did her employment documents outline the religious duties for the Co-Director of Guidance, but others perceived the position as having a religious component.  *See Grussgott*, 882 F.3d 659-60 ("Thus, the substance of Grussgott's title as conveyed to her and as perceived by others entails the teaching of the Jewish religion to students, which supports the application of the ministerial exception here.").  Given the expectations and responsibilities of guidance counselors at Roncalli, it is perhaps not surprising that Principal Weisenbach explained that Starkey's "track record of . . . commitment to and leadership in these areas of faith formation was a part of what made [him] comfortable elevating [Starkey] to the Co-Director role."  (App. at 25 ¶ 44) (citing her experience as a New Testament teacher, Choir Director, and previous certification as a catechist).  *See Grussgott*, 882 F.3d at 659 (noting the school's reliance on an employee's religious teaching experience when deciding to hire her).

13

Starkey also performed "important religious functions" for the school.  *Hosanna-Tabor*, 565 U.S. at 192.  For example, Starkey's role on the Administrative Council is an important consideration and underscores the ministerial nature of her position.  The Administrative Council and the Department Chairs handled 95% of Roncalli's daily ministry, education, and operations.  (App. at 18 ¶ 7).  Generally seen by the faculty as the "lifeblood of decision-making" at Roncalli, the Administrative Council was responsible for making the "big decisions" "relating to the school's mission, specific student needs, and most other day-to-day operations."  (*Id.* at 18 ¶ 5).  Aside from the Principal and the Assistant Principal for Academic Affairs, the Director of Guidance is the only staff member that serves on the Administrative Council and as a Department Chair.  (*Id.* at 18 ¶ 7).  Thus, Starkey was one of a select group of school leaders responsible for guiding Roncalli in its mission.

While the Council was responsible for some secular duties, the Council also addressed issues more closely related to the school's mission to "form Christian leaders in body, mind, and spirit."  (*Id.* at 18 ¶ 8, 63).  To help focus on this faith formation aspect of the school's mission, the Administrative Council held book discussions to better understand their faith and develop ways to transmit the faith to others.  (*Id.* at 19 ¶ 13-15, 84, 333-35).  The Council also discussed the ways in which Roncalli can differentiate itself from the local public schools, the biggest difference being that Roncalli serves the students' spiritual, academic, and personal needs and seeks to form them in the Catholic faith.  (*Id.* at 19 ¶ 10).  To that end, the Council continually worked to strengthen the spiritual, social, and emotional elements of the Catholic educational environment.  (*Id.*).

14

For example, the Council discussed how to infuse faith formation into the athletic program.  (*Id.* at 19 ¶ 11).  The Council also planned all-school liturgies, determined the qualifications for who could serve as Eucharistic ministers, and discussed a student "morality survey" that asked students about drug and alcohol use, bullying, and sexual activity.  (*Id.* at 293, 314-16, 323-24, 343).

In addition to the more general work related to Roncalli's religious mission, the Council also identified ways to provide direct support to students and staff.  For example, the Council addressed issues related to students in crisis and distress, as well as how to address the personal and spiritual struggles of faculty members.  (*Id.* at 18 ¶ 8). Following the Parkland school shooting, the Council discussed how best to respond to the concerns and emotions of the student body.  (*Id.* at 19 ¶ 12).  Starkey was an active participant in these discussions.  (*Id.* at 19 ¶¶ 11-12).  Overall, Starkey's role on the Council and her work in helping shape Roncalli's educational and spiritual environment weigh heavily in favor of applying the ministerial exception.

Starkey downplays the religious nature of her role, and highlights her secular duties, such as scheduling students for classes, helping students with college applications, providing SAT and ACT test prep tools, administering AP exams, and offering career guidance.  (Filing No. 127-3, Affidavit of Autumn Currens ("Currens Aff.") ¶ 5; App. at 93-95).  Starkey also testified that she did not pray with her students as part of her regular duties as guidance counselor or Co-Director of Guidance, though she did deliver the morning prayer on more than one occasion.  (App. at 406-07, 440-41).  She goes so far as to say that in her current position as a guidance counselor at a local public school, her

duties are virtually identical to those at Roncalli (save the administrative responsibilities of being a director).  (*Id.* at 442-43).[3]  But this disregards that the school "clearly intended for [Starkey's] role to be connected to the school's [Catholic] mission," *Grussgott*, 882 F.3d at 660, and there is sufficient evidence that Starkey in fact performed many functions that would not be required of a guidance counselor at a secular school: she helped plan all-school liturgies, she delivered the morning prayer on at least a few occasions, she worked with other Administrative Council members to identify ways in which Roncalli can differentiate itself from the local public schools, and she participated in discussion groups about books aimed at enhancing faith formation.  *Cf. Hosanna-Tabor*, 565 U.S. at 708-09 (rejecting argument that a teacher with only 45 minutes of religious duties a day should not qualify as a minister because that argument "place[s] too much emphasis on [the teacher's] performance of secular duties").

Moreover, that Starkey characterizes her work as a guidance counselor in purely secular terms does not change the result because it would be inappropriate for this court to draw a distinction between secular and religious guidance offered by a guidance counselor at a Catholic school.  *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 343 (1987) (Brennan, J., concurring in

---

[3] Starkey also relies on a determination by the Archdiocese's legal counsel that school counselors do not qualify as ministers.  (*See* Filing No. 127-8, Email Regarding Ministerial Exception).  But whether Starkey was a ministerial employee is up to the court to determine as a matter of law. *See Grussgott*, 882 F.3d at 661-62 (declining to consider an expert's opinion on the "ultimate question" of whether the employee was a minister); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 833 (6th Cir. 2015) ("W]hether the exception attaches at all is a pure question of law which this court must determine for itself.").

judgment) ("What makes the application of a religious-secular distinction difficult is that the character of an activity is not self-evident. As a result, determining whether an activity is religious or secular requires a searching case-by-case analysis.  This results in considerable ongoing government entanglement in religious affairs.").  *See also Sterlinski*, 934 F.3d at 570 ("If the Roman Catholic Church believes that organ music is vital to its religious services, and that to advance its faith it needs the ability to select organists, who are we judges to disagree?").  Here, what qualifies as secular or religious guidance in the context of a Catholic high school is exceedingly difficult to identify, and "the purpose of the ministerial exception is to allow religious employers the freedom to hire and fire those with the ability to shape the practice of their faith." *Grussgott*, 882 F.3d at 661.

To be sure, the court does not mean to say that divergent understandings of the religious nature of an employee's role should always be resolved in the religious employer's favor.  For example, it would be difficult to credit a religious employer's claim that a custodian or school bus driver qualifies as a minister simply because the employer said so.  *See Sterlinski*, 934 F.3d at 572 ("A church claiming 'minister' status for bus drivers would invite a finding of pretext, but a church claiming that persons who chant, sing, or play music during a service perform religious functions is on solid ground.").  But this case concerns the Co-Director of Guidance, and the record shows that the Co-Director of Guidance performed "vital religious duties" at Roncalli.  *Our Lady of Guadalupe*, 140 S. Ct. at 2066.  Employees in that position met with every student throughout the year and discussed some of the most sensitive issues in a young person's

life.  Indeed, the term itself—Director of *Guidance*—suggests that those who fill that role are tasked with guiding students as they mature and grow into adulthood.  One may reasonably presume that a religious school would expect faith to play a role in that work, and Roncalli expressly entrusted Starkey with the responsibility of communicating the Catholic faith to students and fostering spiritual growth.  Starkey also served in a senior leadership role in which she helped shape the religious and spiritual environment at the school and guided the school on its religious mission.  For these reasons, the court concludes that the Co-Director of Guidance at Roncalli falls within the ministerial exception.

### C.    The Ministerial Exception Bars All of Starkey's Claims

Having concluded that the ministerial exception applies, the court turns to considering which of Starkey's claims are barred.  Starkey brings the following claims: (1) Title VII discrimination; (2) Title VII retaliation; (3) Title VII hostile work environment; (4) intentional interference with contractual relationship; and (5) intentional interference with employment relationship.[4]  Starkey appears to concede that the ministerial exception bars her discrimination and retaliation claims under Title VII, but she argues her Title VII hostile work environment claim and her two state law claims may proceed.  The court disagrees.

Whether the ministerial exception bars hostile work environment claims was, until recently, an unsettled question within this Circuit.  That question was answered

---

[4] Starkey brings the state law claims against the Archdiocese only.

conclusively in the affirmative in *Demkovich v. St. Andrew the Apostle Parish*, No. 19-2142, 2021 WL 2880232 (7th Cir. July 9, 2021).  "It would be incongruous if the independence of religious organizations mattered only at the beginning (hiring) and the end (firing) of the ministerial relationship, and not in between (work environment)."  *Id.* at * 6.  In light of *Demkovich*, the ministerial exception bars Starkey's hostile work environment claim.

Starkey's state law claims are also barred because those claims implicate the same concerns animating the ministerial exception's application to Starkey's Title VII claims.  While it is certainly not the case that the ministerial exception bars *all* state law claims—battery or breach of contract for failure to pay could surely proceed—those claims that result in the government's interference with a church's selection or supervision of its ministers or the government's intrusion into doctrinal or ecclesiastical territory are barred.  *See Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 123 (3d Cir. 2018) ("The ministerial exception does not apply to, and courts may decide, disputes that do not implicate ecclesiastical matters.").  Here, the decision to not renew Starkey's employment contract goes to the heart of the church's right to "select and control who will minister to the faithful."  *Hosanna-Tabor*, 565 U.S. at 194-95.  Accordingly, the ministerial exception bars Starkey's state law claims for intentional interference with contractual relationship and intentional interference with employment relationship.

Because the court concludes the ministerial exception bars all of Starkey's claims, it declines to address Defendants' alternative argument that her claims are barred by

19

RFRA.  The court also declines to reconsider its denial of Defendants' motion for judgment on the pleadings.

## IV.   Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Filing No. 114) is **GRANTED**.  All other pending motions (Filing Nos. 115 and 124) are **DENIED as MOOT**.  Final judgment shall issue accordingly.


**SO ORDERED** this 11th day of August 2021.



RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.